## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JAMES SCOTT HARRINGTON | ) | |
| and | ) | |
| JOSHUA A. KELLERMAN; | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 5:20-CV-04081-HLT-KGG |
| | ) | |
| STATE OF KANSAS, | ) | |
| | ) | |
| HERMAN JONES, in his individual | ) | |
| capacity; | ) | |
| and | ) | |
| JASON DE VORE, in his individual | ) | |
| capacity; | ) | |
| | ) | |
| Defendants. | ) | |

### AMENDED COMPLAINT

COMES NOW, Plaintiffs James Scott Harrington and Joshua A. Kellerman, through their counsel, Kelly J. Trussell of the law firm of SLOAN, EISENBARTH, GLASSMAN, MCENTIRE & JARBOE, L.L.C., and for their claims against the Defendants, the Plaintiffs allege as follows:

### INTRODUCTION

This civil action is brought by James Scott Harrington and Joshua A. Kellerman to obtain redress for their unlawful employment terminations. The Plaintiffs were both employed by the State of Kansas Highway Patrol. While employed, both Plaintiffs received complaints from female

Exhibit 1

employees regarding the sexual harassment and gender discrimination acts they suffered within the Agency. The Plaintiffs engaged in protected activity under Title VII by opposing those unlawful actions and their employer responded with retaliatory actions, which included termination. Additionally, both Plaintiffs exercised their rights to free speech by publicly speaking out on matters of public concern. The Defendants violated the Plaintiffs' First Amendment right to free speech by acts of retaliation and ultimately unlawful termination of their employment.

## PARTIES

1.   James Scott Harrington ("Harrington") is a Kansas resident.

2.   Harrington was employed as a state trooper for the Kansas Highway Patrol from 2000 until July 23, 2020, when his employment was terminated.

3.   Joshua A. Kellerman ("Kellerman") is a Kansas resident.

4.   Kellerman was employed as a state trooper for the Kansas Highway Patrol from 2003 until July 23, 2020, when his employment was terminated.

5.   Defendant State of Kansas Highway Patrol ("KHP") is a political subdivision of the State of Kansas with its headquarters' office located in Topeka, Kansas.

6.   Defendant KHP is an employer with over 500 employees in the State of Kansas.

7.   At the time of the Plaintiffs' terminations, Defendant Herman Jones was the Superintendent for the KHP; Plaintiffs' allegations against him are in his individual capacity.

8.   At the time of the Plaintiffs' terminations, Defendant Jason De Vore was the Assistant Superintendent for the KHP; Plaintiffs' allegations against him are in his individual capacity.

## JURISDICTION

9.      This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question claims) and 42 U.S.C. § 2000e (Title VII claims).

10.     All conditions precedent to jurisdiction under 42 U.S.C. § 2000e-5 have been met, including: (i) charges of employment retaliation were filed with the Equal Employment Opportunity Commission and the Kansas Human Rights Commission within 300 days of the commission of the unfair employment practices; (ii) Notifications of Right to Sue were received from the EEOC; and (iii) this Complaint has been filed within 90 days of the receipt of the Notifications of Right to Sue. *See Letters Attached.*

## VENUE

11.     Venue is proper in this district under 28 U.S.C. § 1391 (general venue) and 42 U.S.C § 2000e (Title VII claims).

## FACTUAL ALLEGATIONS

12.     Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

13.     Plaintiff Harrington was hired by KHP in 2000.

14.     Plaintiff Kellerman was hired by KHP in 2003.

15.     In April of 2019, Governor Laura Kelly appointed Herman Jones to the position of Superintendent of KHP.

16.     The Superintendent position carries with it the rank of Colonel within KHP.

17.     In May of 2019, Superintendent Col. Herman Jones selected Jason De Vore to the position of Assistant Superintendent of KHP.

18.     The Assistant Superintendent position carries with it the rank of Lt. Colonel within KHP.

19.     KHP Superintendent Col. Herman Jones and KHP Assistant Superintendent Lt. Col. Jason De Vore created and allowed a hostile work environment of sexual harassment and gender discrimination within KHP.

20.     Plaintiffs Harrington and Kellerman acted in opposition of the hostile work environment of sexual harassment and gender discrimination actions within KHP.

**Harrington Reported the Sexual Harassment of KHP Employees and Engaged in Acts Opposing KHP's Prohibited Discrimination**

21.     Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

22.     Harrington, with the rank of Major, reported to both Col. Jones and Lt. Col. De Vore within his employment duties.

23.     On or about June 3, 2019, Harrington, Kellerman, and another KHP employee were in a meeting with Lt. Col. De Vore and were told, "if you are subversive, if I catch wind of you being subversive, you will be gone and will not have a seat at this table."

24.     At this same meeting, Harrington, Kellerman, and another KHP employee were told by Lt. Col. De Vore that they were only allowed to follow their chain of command for any issues with KHP and that "everything was to be run through me."

25.     On or about June 25, 2019, Harrington met with a KHP employee ("Employee A") whom he supervised within his employment duties.

26.     During this meeting, Harrington was informed by Employee A that KHP was taking unlawful gender discrimination actions against her that also included retaliation by KHP.

27. On or about June 26, 2019, Harrington informed Lt. Col. De Vore of Employee A's complaints to him and De Vore responded that he would "take care of it."

28. Harrington remained Employee A's supervisor after the June 26, 2019, meeting with Lt. Col. De Vore.

29. On or about July 1, 2019, Lt. Col. De Vore met with Employee A and deliberately excluded Harrington from this meeting.

30. On or about August 13, 2019, Harrington was told by a KHP employee ("Employee B"), who was not under Harrington's employment supervision, that she was inappropriately physically touched by Col. Jones in Lt. Col. De Vore's presence.

31. Employee B stated that she told Col. Jones that his touching of her was inappropriate, to which he responded by touching her again and telling her "there, I take it back."

32. Harrington told Employee B to contact the KHP Director of Human Resources to discuss and report this incident.

33. On or about August 19, 2019, Harrington attended a Major's Meeting with Lt. Col. De Vore.

34. During this meeting, Harrington was again told by Lt. Col. De Vore that if he did not play on their team, Harrington would be removed from his position.

35. During this meeting, Col. Jones came into the room and made an inappropriate comment about his wife, of a sexual nature, directed at Harrington.

36. On or about August 26, 2019, Harrington's workload was increased by the supervision of two additional units and he was advised that he was no longer supervising Troop J, an employment duty that both Col. Jones and Lt. Col. De Vore knew Harrington was especially fond of.

37. Harrington questioned Lt. Col. De Vore as to why he would no longer be supervising Troop J and was told "that is what the Colonel wanted."

38. On or about August 27, 2019, Employee A again reported to Harrington her beliefs that she was experiencing gender discrimination by KHP leadership.

39. On or about September 23, 2019, Harrington met with two female KHP employees ("Employee C" and "Employee D").

40. Neither Employee C nor Employee D were under Harrington's employment supervision.

41. Employee C reported, with factual details, to Harrington that she was experiencing sexual harassment and gender discrimination by Col. Jones.

42. Harrington advised Employee C to report these actions to the KHP Director of Human Resources.

43. Employee D reported to Harrington that she had serious concerns about Col. Jones's sexual harassment actions toward another KHP employee ("Employee E").

44. Employee E was not under the employment supervision of Harrington.

45. On or about September 23, 2019, Harrington was informed by Lt. Col. De Vore that Employee A would eventually be terminated.

46. At this same September 23, 2019 meeting, Lt. Col. De Vore made statements to Harrington regarding De Vore and Col. Jones's decision to not allow Harrington to attend the FBI National Academy in December of 2019, an honor Harrington was previously selected for and looked forward to attending for over two years.

47. On or about September 24, 2019, Employee A reported to Harrington that she was still experiencing gender discrimination by KHP leadership.

48.  Employee A also stated to Harrington that she was frustrated by Col. Jones's sexual harassment of other female employees.

49.  Employee A told Harrington she had been in continuous contact with the KHP Director of Human Resources regarding her discrimination complaints.

50.  Employee A also stated that she believed a female KHP employee ("Employee F") was leaving her employment because of the sexual harassment and gender discrimination by KHP.

51.  Harrington responded to this information by meeting with Employee F and asking her why she was leaving KHP employment.

52.  Employee F was under the employment supervision of Harrington.

53.  Employee F told Harrington that she was leaving because of Col. Jones's sexual harassment and gender discrimination of many female KHP employees.

54.  Employee F stated that Lt. Col. De Vore was also responsible for the gender discrimination against female KHP employees.

55.  Employee F told Harrington she could no longer work in an environment where women were treated so poorly.

56.  Harrington personally reported the information Employee F provided to him to the KHP Director of Human Resources.

57.  On September 26, 2019, Harrington reported to Lt. Col. De Vore that Employee F intended to leave KHP employment.

58.  Lt. Col. De Vore responded by telling Harrington and the KHP Director of Human Resources to "hold off" on filling Employee F's position.

59.    On or about October 7, 2019, Harrington attended a senior staff meeting which included many civilian section heads and the Professional Standards Unit.

60.    During this meeting, Col. Jones addressed the group and stated the performance of the responding Troopers to a recent fatality crash was "like white on rice."

61.    Several of those in attendance of this meeting complained to Harrington that the race-based comment by Col. Jones was inappropriate and offensive.

62.    On or about October 9, 2019, while in a KHP restroom, Col. Jones made an inappropriate comment, of a sexual nature, to Harrington, when he referred to the liquid soap in his hand as resembling semen and stated he "hadn't seen that stuff in a while."

63.    On or about October 10, 2019, a female KHP employee ("Employee G") called Harrington to report Col. Jones had sent her Instant Messages that were of a graphic sexual nature and were offensive to her.

64.    On or about October 11, 2019, Lt. Col. De Vore called Harrington to inform him that Col. Jones was terminating Employee A's employment on October 14, 2019, and that "they" would need Harrington to gather her things and walk her out of the building after her termination.

65.    Also on or about October 11, 2019, Employee G met with Harrington to report Col. Jones had continued to send Instant Messages like the day before that were of a graphic sexual nature and were offensive to her.

66.    Employee G told Harrington that Col. Jones's messages and behavior were sexual harassment.

67.    Employee G told Harrington that she was reporting the sexual harassment to the Kansas Department of Administration.

68.  Harrington felt helpless in his efforts to assist the female KHP employees in making complaints of the discrimination they were experiencing.

69.  On October 14, 2019, Employee G was present with Employee A while Col. Jones terminated Employee A's employment.

70.  On October 24, 2019, Harrington noticed that Employee E was visibly upset.

71.  Harrington asked Employee E if she was upset.

72.  Employee E then detailed to Harrington a sexual harassment incident by Col. Jones and stated that Employee C had witnessed it.

73.  Employee E told Harrington that she was intimidated by Col. Jones.

74.  Harrington encouraged Employee E to report this, and any, sexual harassment to the KHP Director of Human Resources.

75.  Harrington called Employee E's direct supervisor, Kellerman, and informed him of her incident of sexual harassment.

76.  Harrington also called the KHP Director of Human Resources to report the sexual harassment that Employee E had relayed to him.

77.  Harrington then went to Employee C and asked her about the sexual harassment of Employee E that he believed she had witnessed.

78.  Employee C confirmed the sexual harassment of Employee E and also told Harrington that she too was a victim of Col. Jones's sexual harassment and gender discrimination.

79.  Harrington told Employee C to report Col. Jones's discrimination and sexual harassment to the KHP Director of Human Resources.

80.  Harrington again contacted the KHP Director of Human Resources and explained that he believed there was a pattern of behavior from Lt. Col. De Vore and Col. Jones that

discriminated against KHP female employees and also amounted to the sexual harassment of them.

81. Harrington then met with Craig Kibbe, a Deputy Director of Human Resources under the Kansas Department of Administration.

82. Neither Craig Kibbe, nor the Department of Administration, supervises Harrington's employment.

83. Harrington's conversation with Craig Kibbe was in Harrington's personal capacity, outside the scope of his employment with KHP, to seek personal advice on how to report the illegal behavior of Col. Jones and Lt. Col. De Vore and improve the working environment within KHP.

84. Harrington discussed the details of the gender discrimination and sexual harassment of female KHP employees with Craig Kibbe.

85. Kibbe told Harrington that Col. Jones was well-known and supported by the community.

86. Kibbe agreed with Harrington that the female KHP employees were experiencing a hostile work environment.

87. Kibbe was uncomfortable with discussing the matter further with Harrington.

88. Kibbe then expressed his appreciation of Harrington's support of the KHP Director of Human Resources regarding the discrimination reports she was receiving from KHP employees.

89. On or about October 25, 2019, the KHP Director of Human Resources reported to Harrington that she had discussed the details of the gender discrimination and sexual harassment of female KHP employees with Craig Kibbe, who was her supervisor within the Department of Administration.

90.     On or about October 28, 2019, a KHP employee ("Employee H") reported to Harrington that Col. Jones made an inappropriate sexual comment, accompanied with sexual body gestures, to female KHP employees at the KHP Academy in Salina.

91.     Employee H told Harrington that a female KHP employee ("Employee I") was unhappy about the comments from Col. Jones and that she believed them to be inappropriate.

92.     Employee H also told Harrington that Employee I stated that she tries to "tune out" a lot of what Col. Jones says to her because of the many inappropriate things he says to the female KHP employees.

93.     Employee H was not under the employment supervision of Harrington.

94.     Harrington told Employee H to report Col. Jones's actions and comments to the KHP Director of Human Resources.

95.     On or about October 31, 2019, Employee C and Employee E reported another sexual harassment incident regarding Col. Jones.

96.     Employee E told Harrington that she was scared of Col. Jones, she did not want him to put his hands on her, and that he made unwelcome sexual comments to her nearly every time he saw her.

97.     Employee E told Harrington that while she was sitting down and eating lunch with Employee C, Employee E was physically touched and then verbally sexually harassed by Col. Jones upon him entering the room.

98.     Col. Jones, referring to Employee E's body, asked her why she always "shakes it" for him when he is around.

99.     Employee C witnessed the sexual harassment of Employee E and both were advised by Harrington to report this incident to the KHP Director of Human Resources.

100.   Harrington also personally reported this incident to the KHP Director of Human Resources.

101.   Harrington additionally relayed this information to Kellerman, the direct supervisor of Employee E.

102.   On or about November 7, 2019, Employee B reported to Harrington that during a meeting she was again physically touched and felt singled out, in a gender discriminatory manner, by Col. Jones.

103.   Employee B reported to Harrington that she previously told Col. Jones that she did not want him to physically touch her, but that he continued to do so.

104.   Harrington told Employee B to report the incident to the KHP Director of Human Resources.

105.   On or about December 5, 2019, it was reported to Harrington that Col. Jones had made an inappropriate comment, of a sexual nature, also accompanied by body gestures, to female KHP employees while he was attending the Troop J recruit graduation.

106.   Harrington was told that the female KHP employees reported that, while it was offensive to them, they were "used to" his inappropriate behavior and that it had become the "norm" when he was in the building.

107.   On or about December 27, 2019, Employee B reported to Harrington that she was again physically touched, and felt singled out in a gender discriminatory manner, by Col. Jones.

108.   Employee B told Harrington she would report this incident to the KHP Director of Human Resources.

### Harrington Asserted His Free Speech Rights and Reported His Knowledge of KHP's Illegal Actions by Jones and De Vore to Public Officials

109.   Harrington again went outside KHP to speak out and report illegal actions within the agency.

12

110.   Between January and February of 2020, Harrington met with a Kansas State Senator ("Legislator A") in an effort to inform her of the female KHP employees' complaints of discrimination and harassment; to seek guidance regarding his assistance with reporting their complaints; to discuss his beliefs of other illegal actions by Col. Jones within KHP; and to inform her of the low morale within KHP itself.

111.   Harrington's conversations with Legislator A were in Harrington's personal capacity, outside the scope of his employment with KHP, to inform her of information relating to public interest, to seek personal advice on how to report the illegal behavior of Col. Jones and Lt. Col. De Vore, and to ultimately improve the working environment with KHP.

112.   Legislator A told Harrington that she would discuss these issues with Gov. Laura Kelly.

113.   Between January and February of 2020, Harrington also met with a Kansas State Representative ("Legislator B") in an effort to inform him and seek guidance assisting the female KHP employees with their complaints; to discuss other illegal actions by Col. Jones and Lt. Col. De Vore within KHP; and to inform him of the low morale within KHP.

114.   Harrington's conversations with Legislator B were in Harrington's personal capacity, outside the scope of his employment with KHP, to inform him of information relating to public interest, and to seek personal advice on how to report the illegal behavior of Col. Jones and Lt. Col. De Vore and ultimately improve the working environment with KHP.

115.   In February of 2020, Harrington also met with a Kansas State Representative ("Legislator C") to discuss and seek guidance on assisting the female KHP employees with their complaints; to discuss other illegal actions by Col. Jones and Lt. Col. De Vore within KHP; and to inform him of the low morale within KHP.

116.    Harrington's conversations with Legislator C were in Harrington's personal capacity, outside the scope of his employment with KHP, to inform him of information relating to public interest, to seek personal advice on how to report the illegal behavior of Col. Jones and Lt. Col. De Vore, and to ultimately improve the working environment with KHP.

**Harrington Continued to Report the Sexual Harassment of KHP Employees and Oppose KHP's Prohibited Discrimination and Retaliation Against Him Intensified**

117.    On or about February 3, 2020, Employee D reported to Harrington that she had expressed her concerns to Major Eric Sauer regarding the gender discrimination and sexual harassment environment of the female KHP employees.

118.    Employee D had previous numerous conversations with Harrington, dating back to September 2019, about the hostile work environment and how poorly the female KHP employees were being treated.

119.    Employee D told Harrington that she was planning to leave the agency for a much lower paying job, because she could not tolerate the behavior by Col. Jones, Lt. Col. De Vore or Major Sauer any longer.

120.    Employee D told Harrington she planned to report all the sexual harassment behavior and gender discrimination she witnessed and suffered to the KHP Director of Human Resources.

121.    Employee D also told Harrington that her biggest concern was the "obsession" that Col. Jones had with Employee E and that the obsession was obvious to every female KHP employee at the headquarters' office.

122.    Harrington reported the information relayed by Employee D to the KHP Director of Human Resources.

123.    On or about February 12, 2020, the KHP Director of Human Resources told Harrington about a meeting that occurred between her, Col. Jones, and Lt. Col. De Vore the previous day in Jones's office.

124.    She told Harrington that she felt attacked by Col. Jones and Lt. Col. De Vore when they relayed to her that the Governor's office had received an anonymous letter and she was accused of sending it.

125.    The letter to the Governor's office identified Col. Jones as being inappropriate with women at KHP, committing ethics violations regarding failure to use sick/annual leave when he was off, his illegal use of the state issued P-Card, and other items of that nature.

126.    She told Harrington that she told Col. Jones that she did not send the letter but also that she knew there were many people who could have done so within the agency.

127.    She told Harrington that Col. Jones said that if he found out who sent the letter, or who had anything to do with the information relayed within it, he would "see that they have a parting of the ways with this agency."

128.    She told Harrington that she believed he was threatening her job with KHP because she was supportive of the female employees' discrimination and harassment complaints.

129.    On or about February 21, 2020, Employee E reported to Harrington that another incident of sexual harassment by Col. Jones had occurred.

130.    Employee E relayed the details of the incident to Harrington, which included physical touching, of a sexual nature, along with inappropriate comments, of a sexual nature.

131.    Employee E told Harrington that Col. Jones came up to her from behind, put his hands on her back and asked her, "does this make you feel uncomfortable?"

132.    Employee E told Harrington that Col. Jones was so close to her when he asked his question that she could feel his breath on the back of her neck and that it made her feel scared and disgusted.

133.    Harrington reported this incident to Employee E's supervisor, Kellerman, as well as the KHP Director of Human Resources.

134.    On or about February 21, 2020, Employee B informed Harrington that she had met with Kraig Knowlton, Director of the Office of Personnel Services for Kansas Department of Administration.

135.    Employee B reported her concerns of the sexual harassment and gender discrimination of female KHP employees to Knowlton.

136.    Employee B told Harrington that Knowlton was planning to initiate an investigation into the complaints.

137.    Under information and belief, Knowlton's meeting with Employee B was initiated after Legislator A discussed the information previously relayed to her by Harrington with Gov. Laura Kelly.

138.    On or about February 28, 2020, Employee B told Harrington that she had met with an investigator with the Department of Administration regarding the allegations of the sexual harassment and gender discrimination of female KHP employees.

139.    On or about March 3, 2020, Employees C and E told Harrington that they were meeting with investigators with the Department of Administration regarding their complaints of sexual harassment and gender discrimination of female KHP employees.

140.    Employees C and E also told Harrington that they were both scared of what would happen if Col. Jones or Lt. Col. De Vore found out they met with the Department of Administration investigators.

141.    Employees C and E told Harrington that they specifically told the investigators that they had previously reported multiple incidents of sexual harassment and gender discrimination to Harrington, Kellerman, and the KHP Director of Human Resources.

**Harrington Was Specifically Named to His Employer by the Kansas Department of Administration as an Employee Reporting the Sexual Harassment of KHP Employees and Acting in Opposition of KHP's Prohibited Discrimination**

142.    Kraig Knowlton, Director of the Office of Personnel Services for Kansas Department of Administration drafted a "Summary of Findings" regarding the investigation of the female KHP employees reporting complaints of sexual harassment and gender discrimination.

143.    Knowlton's Summary of Findings was directed to Will Lawrence, Gov. Kelly's Chief of Staff, and to Ryan Wright, Gov. Kelly's Deputy Chief of Staff.

144.    Knowlton's Summary of Findings detailed many of the same occurrences of sexual harassment and discrimination that are alleged within this Complaint.

145.    Knowlton's Summary of Findings specifically identified Harrington and Kellerman and stated that they "urged" the female KHP employees to come forward and make complaints of the sexual harassment and discrimination they suffered.

146.    Knowlton's Summary of Findings reported that "due to the extremely strong likelihood of bias against Col. Jones" by the female employees making the complaints, it was difficult to wholly substantiate the allegations.

147.   Knowlton's Summary of Findings also reported that Col. Jones's "double entendres or questionable statements" could not be clearly defined as sexual harassment by the investigators.

148.   Upon information and belief, Col. Jones was informed of Knowlton's Summary of Findings and its contents.

**The Employment Retaliation Against Harrington Ultimately Results in Termination**

149.   On or about March 10, 2020, Lt. Col. De Vore met with Harrington.

150.   Lt. Col. De Vore was angry with Harrington and asked him about an incident involving Harrington acting on an employee's grievance differently than Lt. Col. De Vore had directed Harrington to act.

151.   Harrington told Lt. Col. De Vore that he believed the action directed by Lt. Col. De Vore to be an unethical manipulation of policy, and therefore, he did not comply with it.

152.   Lt. Col. De Vore responded to Harrington by shouting, "who do you think you are?"

153.   Harrington responded to Lt. Col. De Vore that he was "not going to be a part of anything that was unethical."

154.   Lt. Col. De Vore then told Harrington that they were going to have a "big boy" conversation.

155.   Harrington told Lt. Col. De Vore that the environment in the KHP office was not good.

156.   Harrington told Lt. Col. De Vore that the KHP employees were not treated well and that there were too many examples to count.

157.   Later that same day, Col. Jones met with Harrington.

158.   Harrington relayed to Col. Jones that he believed the prevention of him attending the FBI National Academy and removing Troop J from his supervision were acts of retaliation against him.

159.   Col. Jones told Harrington that he was going to figure out who the people were who were not in his "canoe" with him and "deal with them."

160.   Harrington told Col. Jones that he had never seen anything like what he has experienced at KHP since Col. Jones became Superintendent.

161.   Col. Jones told Harrington he wanted to be his friend at KHP.

162.   Harrington left the meeting with Col. Jones and again met with Lt. Col. De Vore.

163.   Lt. Col. De Vore told Harrington that he wished he could make Harrington happy with KHP and be his friend at KHP.

164.   During the remainder of March and April of 2020, Harrington was predominantly working remotely, due to COVID policies in place.

165.   On or about May 5, 2020, during a conference call with Lt. Col. De Vore, Harrington and Kellerman were asked by Lt. Col De Vore if they disagreed with the decision to not allow a female KHP employee ("Employee J") a different position within KHP.

166.   The position Employee J was requesting was a supervisory position within KHP.

167.   Harrington and Kellerman both expressed their opposition to deny Employee J this position, as KHP policy would deem her qualified for the position.

168.   Harrington and Kellerman both expressed that not allowing Employee J this position violated KHP policy and did not reflect well on the administration.

169.   Lt. Col. De Vore angrily responded to Harrington and Kellerman's statements by saying, "The Colonel has the right to do whatever he needs to do for the agency."

170. For many years, both Harrington and Kellerman have known Lt. Col De Vore to openly have the opinion that women do not belong in law enforcement.

171. It was clear during Lt. Col. De Vore's conference call that Col. Jones and Lt. Col. De Vore did not want Employee J to have the leadership position, and Harrington and Kellerman, the only majors expressing opposition on the call, believed that it was solely because she is female.

172. On or about May 27, 2020, Employee E returned to the office after working remotely due to COVID policies.

173. Employee E reported to Harrington that upon her return, she had been sexually harassed by Col. Herman by a very inappropriate physical touching, of a sexual nature.

174. Employee E reported that Col. Jones touched her shoulder, slid his hand down her arm and across her legs, grabbed her left hand and made a statement that he welcomed her back to the office.

175. Employee E was in distress while reporting this incident to Harrington and asked Harrington if she could discuss this incident with the KHP Director of Human Resources.

176. Harrington encouraged her to do that and he also reported the incident to the KHP Director of Human Resources himself.

177. Harrington additionally reported this incident to Kellerman, Employee E's supervisor.

178. Between May 29 and June 17, 2020, Harrington received complaints of sexual harassment, inappropriate comments, and unprofessional behavior toward female employees very frequently, nearly daily, from various KHP employees in positions as Troopers, Lieutenants, Captains, and office personnel.

179.    Between May 29 and July 23, 2020, Harrington was excluded from fiscal meetings with Col. Jones and Lt. Col. De Vore.

180.    Between May 29 and July 23, 2020, Harrington was excluded from meetings with Captain Jim Oehm, the commander of Troop M.

181.    Between May 29 and July 23, 2020, Col. Jones and Lt. Col. De Vore no longer sought out Harrington's opinions, insight, or information regarding his employment duties.

182.    On or about June 17, 2020, Employees B and E both reported to Harrington that they had met with the law firm attorneys that were hired by the State to conduct an "investigation" into allegations made against Col. Jones.

183.    Employee E reported to Harrington that during her interview, she felt the attorneys made fun of her and blamed her for Col. Jones's conduct toward her.

184.    Employee E reported to Harrington that she did not believe that the investigation was taken seriously, nor would positive results occur from it.

185.    Employee E reported to Harrington that she had told the investigation attorneys that the female KHP employees had been reporting their complaints to Harrington and Kellerman and that Harrington and Kellerman had consistently encouraged them to report to the KHP Director of Human Resources, which they had done.

186.    On or about June 22, 2020, the KHP Director of Human Resources reported to Harrington that she had met with the attorneys conducting the investigation and she did not believe that the investigation would positively address the sexual harassment and gender discrimination within KHP.

187.    On or about July 13, 2020, during the regular Monday Morning Majors' Meeting, Lt. Col De Vore advised of a "fiscal project meeting" scheduled for July 23, 2020.

188.    After the Majors' meeting, Harrington asked the KHP CFO, who directly reports to him under his employment supervision, if there were any issues with the projects that could be reviewed at the upcoming meeting July 23, 2020.

189.    The CFO told Harrington that there were no issues and that she had already had a meeting regarding the projects with Col. Jones and Lt. Col. De Vore.

190.    The CFO also told Harrington that Col. Jones and Lt. Col. De Vore had specifically not wanted Harrington to attend that previous meeting with her.

191.    Between July 14, 2020, and July 23, 2020, Harrington had little, if any, contact with Lt. Col. De Vore.

192.    Between July 14, 2020 and July 23, 2020, Harrington's calendar rights for Lt. Col. De Vore's were changed so that Harrington could no longer view any details on Lt. Col. De Vore's calendar or meetings.

193.    Between July 14, 2020 and July 23, 2020, Harrington was only told that Col. Jones was traveling on vacation and Harrington had no contact with him.

194.    On July 23, 2020, Harrington was asked by Lt. Col. De Vore to go into Col. Jones's office.

195.    Harrington went into Col. Jones's office with Lt. Col. De Vore; others present in the room were Col. Jones, Luther Ganieany, General Counsel for KHP, and Craig Kibbe, from Kansas Department of Administration.

196.    Col. Jones told Harrington that he was "tasked with cleaning up the Patrol."

197.    Col. Jones told Harrington that he was relieving him of his duties and asked him to sign a prepared letter of resignation.

198.    Harrington asked Col. Jones why his employment was ending, to which Jones told Harrington, "You know why."

199.    Harrington asked Col. Jones what the alternative was to him resigning and Col. Jones told him, "You are fired."

200.    Ultimately, Harrington accepted the option to resign his employment, in leu of termination.

201.    Harrington's resignation amounts to a constructive discharge by his employer.

### The State Further Retaliated Against Harrington for Filing a Formal EEOC Charge of Discrimination After His Employment Ended

202.    On August 17, 2020, Harrington filed a formal Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the State of Kansas and Kansas Highway Patrol.

203.    Harrington's Formal Charge alleged employment retaliation for his reporting of KHP's sexual harassment and his acts in opposition of gender discrimination.

204.    After his retaliatory discharge from KHP employment, Harrington formally retired from his employment with the State of Kansas.

205.    Harrington was informed by Kansas Public Employees Retirement System ("KPERS") that he would have been statutorily allowed 240 hours of his accrued sick leave pay if his retirement date had coincided with his employment end date.

206.    Harrington was also informed that his employer could voluntarily authorize the payment of his accrued sick leave pay.

207.    Harrington also personally knew that the State had previously placed other KHP employees on short administrative leaves in order to accommodate and authorize the payment of benefits such as his accrued sick leave pay.

208.    Harrington contacted the benefits coordinator for KHP and inquired about obtaining authorization to pay his accrued sick leave.

209.   Harrington was told that the KHP Director of Human Resources agreed that he should be entitled to 240 hours of his accrued sick leave pay.

210.   Harrington was told that the KHP Director of Human Resources would request Col. Jones to approve the accrued sick leave be paid to Harrington.

211.   Col. Jones responded by asking that Harrington write a letter to him requesting his approval to have the accrued sick leave paid.

212.   Harrington sent the written request to Col. Jones, which was delivered to Col. Jones on August 19, 2020.

213.   Col. Jones never responded, nor approved, the sick leave be paid to Harrington.

214.   Harrington then contacted Will Lawrence, Gov. Kelly's Chief of Staff, to inquire whether he could obtain the approval to have Harrington's accrued sick leave paid.

215.   During a telephone call on October 8, 2020, Mr. Lawrence told Harrington that he had accommodated other former KHP employees to allow them to obtain retirement benefits such as Harrington was requesting.

216.   Mr. Lawrence told Harrington that if he had been involved in the timing of Harrington's employment ending, he would have accommodated him as well.

217.   However, Mr. Lawrence told Harrington that his EEOC Charge was problematic because he had caused additional problems within the KHP agency and he would not accommodate him because he had filed the Charge.

218.   Mr. Lawrence then told Harrington that he would approve the payment of his accrued sick leave only if Harrington dismissed the EEOC Charge of Discrimination and did not pursue his discrimination claims against the State of Kansas.

219.   Harrington refused to agree to not pursue his discrimination claims against the State of Kansas.

220.   Mr. Lawrence did not accommodate Harrington or assist him to obtain authorization for payment of his accrued sick leave.

221.   Mr. Lawrence's sole reason for not accommodating Harrington's sick leave pay was in retaliation for Harrington filing a Charge of Discrimination with the EEOC against the State.

**Kellerman Reported the Sexual Harassment of KHP Employees and Engaged in Acts Opposing KHP's Prohibited Discrimination**

222.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

223.   Kellerman, with the rank of Major, reported to both Col. Jones and Lt. Col. De Vore within his employment duties.

224.   On or about June 3, 2019, Kellerman, Harrington, and another KHP employee were in a meeting with Lt. Col. De Vore and were told, "if you are subversive, if I catch wind of you being subversive, you will be gone and will not have a seat at this table."

225.   At this same meeting, Kellerman, Harrington, and another KHP employee were told by Lt. Col. De Vore that they were only allowed to follow their chain of command for any issues with KHP and that "everything was to be run through me."

226.   On or about June 5, 2019, Kellerman met privately with Lt. Col. De Vore.

227.   During this meeting, Lt. Col. De Vore again told him that if he was subversive he would be removed from the table and stated that Col. Jones had given him the authority to do so.

228. On or about August 13, 2019, Employee B told Kellerman that she was inappropriately touched by Col. Jones, in Lt. Col. De Vore's presence.

229. Employee B told Kellerman that she had stated to Col. Jones that she believed his touching of her was inappropriate and unwelcome.

230. Employee B told Kellerman that she would report the incident to the KHP Director of Human Resources.

231. On or about August 19, 2019, Kellerman was advised that he was no longer supervising Information Technology, an employment duty that both Col. Jones and Lt. Col. De Vore knew Kellerman was especially fond of.

232. On or about October 7, 2019, Kellerman attended a senior staff meeting which included many civilian section heads and the Professional Standards Unit.

233. During this meeting, Col. Jones addressed the group and referred to the performance of the responding Troopers to a recent fatality crash with an inappropriate race-based comment.

234. On October 24, 2019, Kellerman received a call from Harrington detailing a report of sexual harassment he had received from Employee E, whom Kellerman supervised.

235. Employee E had reported to Harrington a sexual harassment incident by Col. Jones and she stated that Employee C had witnessed it.

236. Kellerman was told by Harrington that Employee E was intimidated by Col. Jones.

237. Kellerman was informed by Harrington that Employee E was told to report any sexual harassment to the KHP Director of Human Resources.

238. Kellerman called the KHP Director of Human Resources to report what Harrington had relayed to him regarding Employee E's sexual harassment.

239.    Throughout October 2019, Kellerman was also made aware of other instances of Col. Jones's sexual harassment of Employee E.

240.    Kellerman discussed these incidents with Harrington and they both agreed to be more watchful of Col. Jones's actions with Employee E.

241.    On or about November 7, 2019, Employee B reported to Kellerman that she was again physically touched and felt singled out, in a gender discrimination manner, at a meeting with Col. Jones.

242.    Kellerman told Employee B to report the incident to the KHP Director of Human Resources.

**Kellerman Asserted His Free Speech Rights and Reported His Knowledge of KHP's Illegal Actions by Jones and De Vore to Public Officials**

243.    Between January and March of 2020, Kellerman met with Legislator B to discuss the low morale issues within KHP and the working environment within KHP.

244.    Kellerman's conversations with Legislator B were in Kellerman's personal capacity, outside the scope of his employment with KHP, and were done to inform and to report the behaviors of Col. Jones and Lt. Col. De Vore and the leadership of KHP.

245.    In February of 2020, Kellerman met with a Kansas State Representative ("Legislator D") to discuss to discuss the low morale issues within KHP, the poor working environment within KHP. as well as other illegal actions by Col. Jones and Lt. Col. De Vore within KHP.

246.    Kellerman's conversations with Legislator D were in Kellerman's personal capacity, outside the scope of his employment with KHP, and were to inform and report the behaviors of Col. Jones and Lt. Col. De Vore and the leadership of KHP.

**Kellerman Continued to Report the Sexual Harassment of KHP Employees and Oppose
KHP's Prohibited Discrimination and Retaliation Against Him Intensified**

247.   On or about February 21, 2020, Kellerman was told by Harrington that Employee E had
reported to him another incident of sexual harassment by Col. Jones had occurred against
her.

248.   Harrington relayed the details of Employee E's incident to Kellerman, which included
physical touching, of a sexual nature, along with inappropriate comments, of a sexual
nature.

249.   Kellerman discussed this incident directly with Employee E, made notes of this incident,
and encouraged her to report it to the KHP Director of Human Resources.

250.   On or about March 3, 2020, Employees C and E told Kellerman they were meeting with
investigators with the Department of Administration regarding their complaints of sexual
harassment and gender discrimination of female KHP employees.

251.   Employees C and E told Kellerman that they were both scared of what would happen if
Col. Jones or Lt. Col. De Vore found out they met with the investigators.

252.   Kellerman told Employees C and E that they were legally protected from retaliation for
reporting the sexual harassment and gender discrimination and that they could confirm that
with the KHP Director of Human Resources.

253.   After meeting with the investigators with the Department of Administration, Employees C
and E told Kellerman that they had told the investigators that they had previously reported
multiple incidents of sexual harassment and gender discrimination to Kellerman,
Harrington, and the KHP Director of Human Resources.

**Kellerman Was Specifically Named to His Employer by the Kansas Department of Administration as an Employee Reporting the Sexual Harassment of KHP Employees and Acting in Opposition of KHP's Prohibited Discrimination**

254.    Kraig Knowlton, Director of the Office of Personnel Services for Kansas Department of Administration, drafted a "Summary of Findings" regarding the investigation of the female KHP employees reporting complaints of sexual harassment and gender discrimination.

255.    Knowlton's Summary of Findings was directed to Will Lawrence, Gov. Kelly's Chief of Staff, and to Ryan Wright, Gov. Kelly's Deputy Chief of Staff.

256.    Knowlton's Summary of Findings detailed many of the same occurrences of sexual harassment and discrimination that are alleged within this Complaint.

257.    Knowlton's Summary of Findings specifically identified Harrington and Kellerman and stated that they "urged" the female KHP employees to come forward and make complaints of the sexual harassment and discrimination they suffered.

258.    Knowlton's Summary of Findings reported that "due to the extremely strong likelihood of bias against Col. Jones" by the female employees making the complaints, it was difficult to wholly substantiate the allegations.

259.    Knowlton's Summary of Findings also reported that Col. Jones's "double entendres or questionable statements" could not be clearly defined as sexual harassment by the investigators.

260.    Upon information and belief, Col. Jones was informed of Knowlton's Summary of Findings and its contents.

**The Employment Retaliation Against Kellerman Ultimately Results in Termination**

261.    During March of 2020, Kellerman had multiple conversations with Col. Jones and Lt. Col. De Vore that were ambiguously worded, but Kellerman perceived them to be retaliatory statements and actions against him.

262.    During the end of March through April of 2020, Kellerman had little contact with Col. Jones or Lt. Col. De Vore, which he perceived as leadership disengaging with him in a retaliatory manner.

263.    On or about May 5, 2020, during a conference call with Lt. Col. De Vore, Kellerman and Harrington were asked by Lt. Col De Vore if they disagreed with the decision to not allow a female KHP employee ("Employee J") a different position within KHP.

264.    The position Employee J was requesting was a supervisory position within KHP.

265.    Kellerman and Harrington both expressed their opposition to deny Employee J this position, as KHP policy would deem her qualified for the position.

266.    Kellerman and Harrington both expressed that not allowing Employee J this position violated KHP policy and did not reflect well on the administration.

267.    Lt. Col. De Vore angrily responded to Kellerman and Harrington's statements by saying, "The Colonel has the right to do whatever he needs to do for the agency."

268.    For many years, both Kellerman and Harrington have known Lt. Col De Vore to openly have the opinion that women do not belong in law enforcement.

269.    It was clear during Lt. Col. De Vore's conference call that Col. Jones and Lt. Col. De Vore did not want Employee J to have the leadership position, and Kellerman and Harrington, the only majors expressing opposition on the call, believed that it was solely because she is female.

270.   On or about May 27, 2020, Employee E returned to the office after working remotely due to COVID policies.

271.   Employee E reported to Kellerman that upon her return, she had been sexually harassed by Col. Herman by very inappropriate physical touching, of a sexual nature.

272.   Employee E was in distress while reporting this incident to Kellerman and Kellerman encouraged her to report the incident to the KHP Director of Human Resources.

273.   Kellerman also told Employee E that she could continue to work from home, based upon COVID policies, and that this would prevent Col. Jones from further sexually harassing her.

274.   Kellerman also received a report from Harrington that Employee E had also reported this incident to him.

275.   On or about June 17, 2020, Employee E reported to Kellerman that she had met with the law firm attorneys hired to conduct an "investigation" into allegations made against Col. Jones.

276.   Employee E reported to Kellerman that during her interview, she felt the attorneys made fun of her and blamed her for Col. Jones's conduct toward her.

277.   Employee E reported to Kellerman that she did not believe that the investigation was taken seriously, nor would positive results occur from it.

278.   Employee E reported to Kellerman that she had told the investigation attorneys that the female KHP employees had been reporting their complaints to Kellerman and Harrington and that Kellerman and Harrington had consistently encouraged them to report to the KHP Director of Human Resources, which they had done.

279.   In July of 2020, Kellerman met with one of the attorneys conducting the investigation into allegations made against Col. Jones.

280.   Kellerman's meeting with the attorney was for KHP business, but for a different KHP legal issue, unrelated to the sexual harassment investigation.

281.   Kellerman expected the attorney to ask him about his involvement with the sexual harassment and reporting of complaints to Human Resources.

282.   Kellerman was not asked about his involvement and the attorney was silent as to the subject of the sexual harassment allegations of female KHP employees.

283.   On July 23, 2020, Kellerman was asked to go into Col. Jones's office.

284.   Kellerman went into Col. Jones's office; others present in the room were Col. Jones, Lt. Col. De Vore, Luther Ganieany, General Counsel for KHP, and Craig Kibbe, from Kansas Department of Administration.

285.   Col. Jones told Kellerman that he was "tasked with cleaning up the Patrol."

286.   Col. Jones handed Kellerman a prepared written resignation for him to sign.

287.   Kellerman asked Col. Jones why his employment was ending, to which Jones smiled and told Kellerman, "You know why."

288.   Kellerman asked whether he was resigning from his position as major or from the KHP.

289.   Craig Kibbe told Kellerman it was from the KHP.

290.   Kellerman asked what his options were, to which Kibbe responded that Kellerman could be demoted back to Captain and terminated with civil service protection.

291.   Kellerman asked if he could discuss the options with an attorney, to which he was told no.

292.   Kellerman then stated he would choose the demotion option.

293.   Col. Jones handed him a different prepared written letter for him to sign, allowing his demotion to Captain and termination.

294.   Kellerman signed the termination and his employment with KHP ended.

**Prior to the Retaliatory Terminations, Governor Kelly's Office Knew Harrington and Kellerman Reported KHP's Sexual Harassment and That They Had Publicly Engaged in Opposition of KHP's Illegal Actions**

295.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

296.   The Kansas Department of Administration provided Governor Laura Kelly's office with an assessment of the accusations made by KHP employees against Col. Jones and Lt. Col. De Vore.

297.   Under information and belief, Governor Laura Kelly's office then directed a law firm to investigate claims made against Col. Jones, including complaints of sexual harassment, complaints of gender discrimination, and complaints of misuse of a state aircraft.

298.   Under information and belief, Governor Laura Kelly, and/or her office, was also informed of the allegations against Col. Jones based upon the information relayed by Harrington and Kellerman to public officials.

299.   Under information and belief, the Department of Administration's investigation summary and/or the law firm's investigation report informed Col. Jones and Lt. Col. De Vore that Harrington and Kellerman had provided information to public officials, as well as to the Department of Administration, and that they had encouraged the KHP Director of Human Resources, as well as female KHP employees, to report the sexual harassment and gender discrimination to proper authorities.

300.   Under information and belief, in response to a question from media regarding how Harrington and Kellerman's terminations related to the investigation into complaints against Col. Jones, KHP spokesman and employee Major Andrew Dean stated in an email that "their performance and leadership was unsatisfactory and did not meet the standards set by their superiors."

## COUNT I: VIOLATION OF TITLE VII
## RETALIATION
### (Harrington)
### (Alleged against State of Kansas/KHP)

301.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

302.   At all times relevant, Defendants State of Kansas and Kansas Highway Patrol were an employer within the meaning of Title VII of the Civil Rights Act of 1964.

303.   Between April 2019 and July 2020, Harrington received complaints made by female KHP employees regarding their events of sexual harassment and gender discrimination by KHP employees.

304.   Between April 2019 and July 2020, Harrington opposed the unlawful discrimination and/or harassment by discussing the unlawful actions with others, including: the KHP Director of Human Resources, current KHP employees, former KHP employees, members of the Kansas State Legislature, and the Kansas Department of Administration.

305.   Between April 2019 and July 2020, Harrington also opposed the unlawful discrimination and/or harassment by directly reporting the unlawful actions to the KHP Director of Human Resources.

306. By opposing unlawful discrimination or harassment against female employees by Defendants, its employees or agents, Harrington was engaged in protected activity under Title VII.

307. Defendants knew Harrington exercised his civil rights and engaged in protected activity because Harrington had made complaints to Col. Jones, Lt. Col. De Vore, the KHP Director of Human Resources, and other KHP supervisors in objection to Defendants' harassment or discrimination against female employees.

308. Under information and belief, Defendants additionally knew Harrington exercised his civil rights because Harrington had discussed the unlawful actions with members of the Kansas State Legislature and the Kansas Department of Administration.

309. Defendants knew Harrington exercised his civil rights and engaged in protected activity because Harrington provided the discrimination complaint process information to female KHP employees to allow them to report the sexual harassment and/or gender discrimination against them.

310. Defendants took adverse employment actions against Harrington, including retaliation; denial of opportunities; unwarranted disciplines; and termination.

311. Harrington's exercise of his civil rights, as alleged in this Complaint, was a direct and proximate cause of Defendants' adverse employment actions.

312. As a result of Defendants' unlawful termination, Harrington has suffered damages.

## COUNT II: VIOLATION OF TITLE VII RETALIATION
### (Harrington's Post-Employment Charge)
### (Alleged against State of Kansas/KHP)

313. Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

314. At all times relevant, Defendants State of Kansas and Kansas Highway Patrol were an employer within the meaning of Title VII of the Civil Rights Act of 1964.

315. On August 17, 2020, Harrington filed a formal Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the State of Kansas and Kansas Highway Patrol, alleging employment retaliation for his acts in opposition to KHP's discrimination.

316. By filing a formal charge of unlawful discrimination with the EEOC, Harrington was engaged in a protected activity under Title VII.

317. Defendants knew Harrington exercised his civil rights and engaged in a protected activity because they were served with a copy of the EEOC Charging Complaint.

318. Defendants engaged in retaliation against Harrington, through the actions of Will Lawrence, the Kansas Governor's Chief of Staff, specifically stating Harrington would not be paid his accrued sick leave because he filed the formal EEOC Charge of Discrimination.

319. Harrington's exercise of his civil rights, as alleged in this Complaint, was a direct and proximate cause of Defendants' adverse and retaliatory actions.

320. As a result of Defendants' unlawful retaliation, Harrington has suffered damages.

**COUNT III: VIOLATION OF TITLE VII**
**RETALIATION**
**(Kellerman)**
**(Alleged against State of Kansas/KHP)**

321. Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

322. At all times relevant, Defendants State of Kansas and Kansas Highway Patrol were an employer within the meaning of Title VII of the Civil Rights Act of 1964.

323.   Between April 2019 and July 2020, Kellerman received complaints made by female KHP employees regarding their events of sexual harassment and gender discrimination by KHP employees.

324.   Between April 2019 and July 2020, Kellerman opposed the unlawful discrimination and/or harassment by discussing the unlawful actions with others, including: the KHP Director of Human Resources, current KHP employees, former KHP employees, and members of the Kansas State Legislature.

325.   Between April 2019 and July 2020, Kellerman also opposed the unlawful discrimination and/or harassment by directly reporting the unlawful actions to the KHP Director of Human Resources.

326.   By opposing unlawful discrimination or harassment against female employees by Defendants, its employees or agents, Kellerman was engaged in a protected activity under Title VII.

327.   Defendants knew Kellerman exercised his civil rights and engaged in a protected activity because Kellerman had made complaints to Col. Jones, Lt. Col. De Vore, the KHP Director of Human Resources, and other KHP supervisors in objection to Defendants' harassment or discrimination against female employees.

328.   Defendants knew Kellerman exercised his civil rights and engaged in a protected activity because Kellerman had provided the discrimination complaint process information to female KHP employees to allow them to report the sexual harassment and/or gender discrimination against them.

329.   Under information and belief, Defendants additionally knew Kellerman exercised his civil rights and engaged in a protected activity because Kellerman had discussed the unlawful

actions with members of the Kansas State Legislature and KHP employees had reported his assistance in reporting their claims to the Kansas Department of Administration.

330. Defendants took adverse employment actions against Kellerman, including retaliation; denial of opportunities; unwarranted disciplines; and termination.

331. Kellerman's exercise of his civil rights, as alleged in this Complaint, was a direct and proximate cause of Defendants' adverse employment actions.

332. As a result of Defendants' unlawful termination, Kellerman has suffered damages.

**COUNT IV: 42 U.S.C. § 1983**
**Harrington First Amendment Violations**
**(Alleged against Jones and De Vore)**

333. Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

334. The First Amendment of the United States Constitution guarantees Plaintiff the right to freedom of speech. Plaintiff's right to free speech is further protected by 42 U.S.C. § 1983, which imposes liability on any person acting under color of state law who deprives Plaintiff of his right of free speech.

335. Plaintiff James Scott Harrington exercised his right of free speech by speaking out on matters of public concern. Specifically, Harrington disclosed information regarding seemingly illegal actions by State of Kansas employees, Superintendent Col. Herman Jones, and Assistant Superintendent Lt. Col. Jason De Vore.

336. Defendants knew Harrington exercised his civil rights by discussing the illegal activities of Col. Jones, Lt. Col. De Vore, and other KHP employees with others, such as: members of the Kansas State Legislature, employees of the Kansas Department of Administration, former KHP employees, current KHP employees, and personal friends.

337.   Furthermore, Harrington was acting as a member of the public speaking on a matter of public concern outside the scope of his official job duties.

338.   Defendants, acting under color of state law, violated Plaintiff's First Amendment right to free speech by retaliating and ultimately terminating his employment for exercising his right.

339.   Defendants' interests in promoting the efficiency of the public service do not outweigh Plaintiff's interests in free speech.

340.   Plaintiff's free speech was a motivating factor in Defendants' decision to terminate Plaintiff.

341.   Defendants' actions against Plaintiff were done willfully or maliciously; intentionally and in gross disregard of the Plaintiff's constitutional rights; and/or in reckless disregard of the Plaintiff's constitutional rights.

342.   Plaintiff has suffered damages of economic loss in addition to other non-economic damages.

**COUNT V: 42 U.S.C. § 1983**
**Kellerman First Amendment Violations**
**(Alleged against Jones and De Vore)**

343.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

344.   The First Amendment of the United States Constitution guarantees Plaintiff the right to freedom of speech. Plaintiff's right to free speech is further protected by 42 U.S.C. § 1983, which imposes liability on any person acting under color of state law who deprives Plaintiff of his right of free speech.

345.   Plaintiff Joshua A. Kellerman exercised his right of free speech by speaking out on matters of public concern. Specifically, Kellerman disclosed information regarding seemingly illegal actions by State of Kansas employees, Superintendent Col. Herman Jones, and Assistant Superintendent Lt. Col. Jason De Vore.

346.   Defendants knew Kellerman exercised his civil rights by discussing the illegal activities of Col. Jones, Lt. Col. De Vore, and other KHP employees with others, such as: members of the Kansas State Legislature, former KHP employees, current KHP employees, and personal friends.

347.   Furthermore, Kellerman was acting as a member of the public speaking on a matter of public concern outside the scope of his official job duties.

348.   Defendants, acting under color of state law, violated Plaintiff's First Amendment right to free speech by retaliating and ultimately terminating his employment for exercising his right.

349.   Defendants' interests in promoting the efficiency of the public service do not outweigh Plaintiff's interests in free speech.

350.   Plaintiff's free speech was a motivating factor in Defendants' decision to terminate Plaintiff.

351.   Defendants' actions against Plaintiff were done willfully or maliciously; intentionally and in gross disregard of the Plaintiff's constitutional rights; and/or in reckless disregard of the Plaintiff's constitutional rights.

352.   Plaintiff has suffered damages of economic loss in addition to other non-economic damages.

### COUNT VI: 42 U.S.C. § 1983
### Harrington's Violation of Right of Due Process
### (Alleged against Jones)

353.    Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

354.    The Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983 prohibit any person, acting under color of state law, from depriving Harrington of a property interest without due process of law.

355.    Harrington, as a permanent employee in the classified service had a protected property interest in his continued employment by the KHP.

356.    The classified service of the State of Kansas is governed by the Kansas Civil Service Act ("KCSA"), K.S.A. 75-2925, *et seq.*

357.    Pursuant to K.S.A. 75-2949d, a permanent employee in the classified service may be dismissed only for cause, specifically, "because of deficiencies in work performance," and/or "because of personal conduct detrimental to the state service."

358.    Pursuant to K.S.A. 75-2949(b), a permanent employee in the classified service is entitled to certain notices of the proposed dismissal or demotion and an opportunity to be heard regarding the proposed dismissal or demotion, prior to such dismissal or demotion occurring.

359.    Defendant Jones, acting under color of state law, caused Harrington to be deprived of a property interest without due process of law on July 23, 2020, when he caused Harrington, through duress or coercion, to involuntarily resign from the KHP.

360.    Specifically, under the totality of the circumstances, Defendant Jones's conduct on July 23, 2020, effectively deprived Harrington of free choice, and caused Harrington to reasonably believe that he had no choice but to resign from the KHP.

361.   Consequently, Harrington's resignation amounted to a constructive dismissal from employment.

362.   As a result of Defendant Jones's deprivation of Harrington's property interest without due process of law, Harrington has sustained damages in the form of past and future compensation (including benefits), emotional distress, mental anguish, and loss of enjoyment of life.

363.   In depriving Harrington of a property interest without due process of law, Defendant Jones acted with malice or with reckless indifference to the federally protected rights of Harrington.  Therefore, Defendant Jones is liable for punitive damages.

### COUNT VII: 42 U.S.C. § 1983
### Kellerman's Violation of Right of Due Process
### (Alleged against Jones)

364.   Plaintiffs reallege and incorporate by reference each and every paragraph of this Complaint as though fully set forth herein.

365.   The Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983 prohibit any person, acting under color of state law, from depriving Kellerman of a property interest without due process of law.

366.   Kellerman, as a permanent employee in the classified service had a protected property interest in his continued employment by the KHP.

367.   The classified service of the State of Kansas is governed by the Kansas Civil Service Act ("KCSA"), K.S.A. 75-2925, *et seq.*

368.   Pursuant to K.S.A. 75-2949d, a permanent employee in the classified service may be dismissed only for cause, specifically, "because of deficiencies in work performance," and/or "because of personal conduct detrimental to the state service."

369.    Pursuant to K.S.A. 75-2949(b), a permanent employee in the classified service is entitled to certain notices of the proposed dismissal or demotion and an opportunity to be heard regarding the proposed dismissal or demotion, prior to such dismissal or demotion occurring.

370.    Defendant Jones, acting under color of state law, caused Kellerman to be deprived of a property interest without due process of law on July 23, 2020, when he caused Kellerman, through duress or coercion, to involuntarily accept demotion in rank and be terminated from the KHP.

371.    Specifically, under the totality of the circumstances, Defendant Jones's conduct on July 23, 2020, effectively deprived Kellerman of free choice, and caused Kellerman to reasonably believe that he had no choice but to accept demotion in rank and be terminated from the KHP.

372.    Consequently, Kellerman's acceptance of a demotion in rank and termination amounted to a constructive dismissal from employment at the rank of Major.

373.    As a result of Defendant Jones's deprivation of Kellerman's property interest without due process of law, Kellerman has sustained damages in the form of past and future compensation (including benefits), emotional distress, mental anguish, and loss of enjoyment of life.

374.    In depriving Kellerman of a property interest without due process of law, Defendant Jones acted with malice or with reckless indifference to the federally protected rights of Kellerman.  Therefore, Defendant Jones is liable for punitive damages.

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor on all claims asserted and against the Defendants for economic damages, compensatory damages, punitive damages, reasonable attorney's fees and costs incurred, for pre and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

Respectfully submitted,

/s/ Kelly J. Trussell
Kelly J. Trussell, #23161
SLOAN, EISENBARTH, GLASSMAN,
 McENTIRE & JARBOE, L.L.C.
534 S. Kansas Avenue, Suite 1000
Topeka, KS  66603-3456
Phone: (785) 357-6311
Fax:(785) 357-0152
ktrussell@sloanlawfirm.com
*ATTORNEYS FOR PLAINTIFFS*

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury on all triable claims.

Respectfully submitted,

/s/ Kelly J. Trussell
Kelly J. Trussell, #23161
SLOAN, EISENBARTH, GLASSMAN,
 McENTIRE & JARBOE, L.L.C.
534 S. Kansas Avenue, Suite 1000
Topeka, KS  66603-3456
Phone: (785) 357-6311
Fax:(785) 357-0152
ktrussell@sloanlawfirm.com
*ATTORNEYS FOR PLAINTIFFS*

## <u>DESIGNATION OF PLACE OF TRIAL</u>

Plaintiffs designate and request that trial take place in Topeka, Kansas.


Respectfully submitted,

/s/ Kelly J. Trussell
Kelly J. Trussell, #23161
SLOAN, EISENBARTH, GLASSMAN,
  McENTIRE & JARBOE, L.L.C.
534 S. Kansas Avenue, Suite 1000
Topeka, KS  66603-3456
Phone: (785) 357-6311
Fax:(785) 357-0152
ktrussell@sloanlawfirm.com
*ATTORNEYS FOR PLAINTIFFS*


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the _____ day of _____, 2021, I electronically filed the foregoing with the clerk of the district court by using the CM/ECF system, which will send a notice of electronic filing to the following parties:

David R. Cooper
Terelle A. Mock
Charles Branson
FISHER, PATTERSON,
  SAYLER & SMITH, LLP
dcooper@fpsslaw.com
tmock@fpsslaw.com
cbranson@fpsslaw.com


_____
Kelly J. Trussell