# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**MARK A. BRUCE,**

        **Plaintiff,**

v.

**LAURA KELLY, in her official capacity as Governor of the State of Kansas, WILL LAWRENCE, in his individual capacity as Chief of Staff to Governor Laura Kelly, and HERMAN T. JONES, in his official and individual capacities as Superintendent of the Kansas Highway Patrol,**

        **Defendants.**

**Case No. 20-4077-DDC-GEB**

## MEMORANDUM AND ORDER

Plaintiff Mark A. Bruce brings this civil rights lawsuit arising from his separation from employment with the Kansas Highway Patrol ("KHP").  He asserts federal constitutional and Kansas law claims against three defendants:  (1) Laura Kelly, the Governor of Kansas, sued only in her official capacity; (2) Will Lawrence, Governor Kelly's Chief of Staff, sued only in his individual capacity; and (3) Herman T. Jones, the current Superintendent of the KHP, sued both in his individual and official capacities.  Defendants have filed a Motion to Dismiss (Doc. 11), asking the court to dismiss each claim asserted against them either for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) or for failing to state a claim under Fed. R. Civ. P. 12(b)(6).[1]

---

[1]     Defendants' motion also asks the court to dismiss plaintiff's claims for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) and for insufficiency of process under Fed. R. Civ. P. 12(b)(5). Doc. 11 at 7–8.  But, defendants' Reply withdraws this argument, explaining that, after defendants filed their Motion to Dismiss, plaintiff cured the service defects.  Thus, the court doesn't need to address the Rule 12(b)(2) and (b)(5) dismissal arguments.

Exhibit 2

For reasons explained, the court grants defendants' motion in part and denies it in part. The court grants defendants' request to dismiss Count IV—plaintiff's 42 U.S.C. § 1983 claim against Superintendent Jones for violating plaintiff's First Amendment free speech rights— because qualified immunity bars this claim.

But, the court denies the motion in part for Counts I, II, and III, and without prejudice. Counts I and II allege § 1983 claims against Governor Kelly and Chief of Staff Lawrence for violating plaintiff's Fourteenth Amendment due process rights, and Count III alleges a Kansas common law claim for tortious interference with prospective business relations against Chief of Staff Lawrence. These claims require plaintiff to allege that defendants deprived him of a property interest or prospective business advantage. Plaintiff alleges that a Kansas statute vested him with such a property interest in continued employment with the KHP at the rank of Major as a member of the classified service. Defendants disagree. They argue that the Kansas statute conferred no such property interest. The Kansas statute at issue—Kan. Stat. Ann. § 74-2113—is not a model of clarity. Each party offers a competing reading of the statute based on its plain language. And, no case law interprets the statute's language to decide whether the rank of Major is a classified or unclassified position in the Kansas civil service. Without any guidance on this unsettled and dispositive question, the court exercises its discretion to certify questions to the Kansas Supreme Court under Kan. Stat. Ann. § 60-3201.

The court explains how it reaches these conclusions, below.

## I.     The Court Won't Convert the Motion to Dismiss to a Motion for Summary Judgment.

Before turning to defendants' Motion to Dismiss, the court addresses an argument that plaintiff asserts in his Opposition to defendants' motion. Plaintiff argues that defendants' Motion to Dismiss relies on matters outside the pleadings. So, plaintiff contends, the court must

invoke Fed. R. Civ. P. 12(d) and convert the motion to dismiss to one for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). The court disagrees that defendants' motion relies on matters outside of the pleadings.

Plaintiff asserts that four exhibits attached to defendants' Motion to Dismiss qualify as matters outside of the pleadings, thus requiring the court to convert the Motion to Dismiss to a Motion for Summary Judgment. Each exhibit is a document filed in a Kansas state mandamus proceeding that plaintiff filed against Governor Kelly and Superintendent Jones. Exhibit 1 is a Petition for Writ of Mandamus that plaintiff filed with the Kansas Supreme Court on January 15, 2020. Doc. 11-1; Pet. in Mandamus, *Bruce v. Kelly*, No. 122,370 (Kan. Jan. 15, 2020). Exhibit 2 is a Memorandum of Points and Authorities in Support of Petition in Mandamus that plaintiff filed with the Kansas Supreme Court on January 15, 2020. Doc. 11-2; Mem. of P. & A. in Supp. of Pet. in Mandamus, *Bruce v. Kelly*, No. 122,370 (Kan. Jan. 15, 2020). Exhibit 3 is a Joint Response to Petition for Writ of Mandamus that Governor Kelly and Superintendent Jones filed with the Kansas Supreme Court on May 1, 2020. Doc. 11-3; Joint Resp. to Pet. for Writ of Mandamus, *Bruce v. Kelly*, No. 122,370 (Kan. May 1, 2020). Exhibit 4 is the Kansas Supreme Court's Order denying plaintiff's Petition for Writ of Mandamus on May 27, 2020. Order, *Bruce v. Kelly*, No. 122,370 (Kan. May 26, 2020).

Because each of the four exhibits is a public document filed with the Kansas Supreme Court in plaintiff's mandamus action, the court may take judicial notice of them. *See, e.g.*, *Gee v. Pacheco*, 627 F.3d 1178, 1194 (10th Cir. 2010) (holding that a district court properly considered records from another lawsuit on a Rule 12(b)(6) motion to dismiss); *see also Pace v.*

*Swerdlow*, 519 F.3d 1067, 1072–73 (10th Cir. 2008) (finding that district court "was correct in considering" state court documents of which it took judicial notice on a Rule 12(b)(6) motion to dismiss); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (explaining that a court may "take judicial notice of its own files and records, as well as facts which are a matter of public record" on a Rule 12(b)(6) motion to dismiss (citation and internal quotation marks omitted)); *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 n.1 (10th Cir. 2004) (considering only the allegations in the Complaint and those alleged in another lawsuit on a Rule 12(b)(6) motion); *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) (explaining that "federal courts, in appropriate circumstances, may take [judicial] notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue").

Also, the court may consider the four exhibits that defendants have attached to their Motion to Dismiss without converting the motion into one for summary judgment.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and *matters of which a court may take judicial notice*." (emphasis added)); *see also Pace*, 519 F.3d at 1072–73 (finding that district court "was correct in considering" state court documents of which it took judicial notice on a Rule 12(b)(6) motion to dismiss); *Grynberg*, 390 F.3d at 1278 n.1 (declining to "recharacterize the defendants' motion as a summary judgment motion because [the court] need consider only the allegations in [plaintiff's] complaint and those in the prior . . . action").

But the court won't consider plaintiff's Declaration that he's attached to his Opposition to the Motion to Dismiss. Doc. 15-1. That document is outside the pleadings, and the court can't consider it on a motion to dismiss.[2] Also, none of the assertions plaintiff makes in his Declaration can change the motion's outcome.

## II.    Factual Background

The following facts come from plaintiff's Complaint (Doc. 1). The court accepts them as true and views them in the light most favorable to plaintiff. *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020) (explaining that on a motion to dismiss the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to" plaintiff (citation and internal quotation marks omitted)).

The KHP is an agency of the State of Kansas that enforces traffic, criminal, and other laws of Kansas throughout the state. Doc. 1 at 2 (Compl. ¶ 8). In June 1989, the KHP hired plaintiff as a trooper. *Id.* at 3 (Compl. ¶ 11). On March 14, 2008, the KHP promoted plaintiff to the position of Major. *Id.* After his promotion, plaintiff served a probationary period of six months, as Kan. Stat. Ann. § 75-2946 requires. *Id.* After this probationary period, plaintiff attained permanent status as a Major in the classified service. *Id.*

On April 2, 2015, then-Governor of Kansas, Sam Brownback, appointed plaintiff to serve as the Superintendent of the KHP, at the pleasure of the Governor. *Id.* (Compl. ¶ 12). In November 2018, Laura Kelly was elected as the Governor of Kansas. *Id.* (Compl. ¶ 13). As Governor-elect, Ms. Kelly announced that plaintiff would remain as KHP Superintendent. *Id.*

---

[2]    Also, plaintiff's Declaration contains improper legal conclusions. *See, e.g.*, Doc. 15-1 at 2 (Bruce Decl. ¶ 5) ("Subsection (a) of [Kan. Stat. Ann. §] 74-2113 is intended to protect both the KHP and officers eligible for promotion to its highest positions.").

On March 28, 2019, Governor Kelly's Chief of Staff, Will Lawrence, summoned plaintiff to Mr. Lawrence's office for a meeting.  *Id.* (Compl. ¶ 14).  In the meeting, Mr. Lawrence told plaintiff that Governor Kelly was not going to retain him as KHP Superintendent.  *Id.*  And, Mr. Lawrence told plaintiff "that 'we need you to resign.'"  *Id.*  After further discussion, plaintiff told Mr. Lawrence that he would resign.  *Id.*  Mr. Lawrence then handed plaintiff a pre-prepared resignation letter.  *Id.*  The letter read:

> Dear Will:
>
> This letter is to advise you that I hereby resign my position as Superintendent of the Kansas Highway Patrol, effective April 6, 2019.
>
> Sincerely,
>
> Mark A. Bruce

*Id.*  Plaintiff signed the resignation letter, and he handed it back to Mr. Lawrence.  *Id.*

Mr. Lawrence then handed plaintiff a pre-prepared letter dated March 18, 2019[3] and signed by Mr. Lawrence.  *Id.* at 4 (Compl. ¶ 15).  The letter stated in relevant part:

> This letter is to confirm receipt and acceptance of your resignation from your position as the Superintendent of the Kansas Highway Patrol (KHP), effective April 6, 2019.  Effective immediately, you are relieved of all duties and authority and are being placed on administrative leave until the effective date of your resignation.
>
> You are to surrender all weapons on your person and turn over any other State of Kansas devices, equipment or property in your immediate possession.  Your computer access and security badge have been inactivated.  Please make arrangements with KHP staff to return all other State of Kansas devices, equipment, or property prior to the effective date of your termination.
>
> . . . .

---

[3]    Plaintiff's Complaint initially refers to the date of the letter as March 18.  Doc. 1 at 4 (Compl. ¶ 15).  But later, it alleges that the letter was dated March 28.  *Id.* (Compl. ¶ 16).  Because the meeting between plaintiff and Mr. Lawrence occurred on March 28, the court assumes that the Complaint's reference to March 18 is a typographical error.  But even if it's not, the date of the letter isn't germane to the dispositive issues presented by defendants' motion.

> Should you have any questions about your benefits, leave, final pay warrant or other personnel matters while on paid administrative leave, please feel free to contact Susan Pfannenstiel . . . .
>
> Thank you for your service to the State of Kansas.  I wish you success in your future endeavors.

*Id.* (emphasis omitted).

During the March 28, 2019 meeting, Mr. Lawrence never discussed with plaintiff the option of returning to plaintiff's former rank of Major.  *Id.* (Compl. ¶ 16).  Based on plaintiff's March 28 conversation with Mr. Lawrence and the language of Mr. Lawrence's letter, plaintiff understood and believed that Governor Kelly was dismissing him from all employment with the KHP.  *Id.*  As a consequence, on March 29, 2019, plaintiff initiated email communications with Mr. Lawrence about retiring from the KHP.  *Id.*  Plaintiff initiated these communications because "he understood and believed that he had no other choice but to retire from the KHP."  *Id.*

On April 2, 2019, plaintiff sent a letter to Governor Kelly, with a copy to Mr. Lawrence. *Id.* at 5 (Compl. ¶ 17).  The letter provided, in relevant part:

> This letter serves as notice that I will retire from the Kansas Highway Patrol effective May 1, 2019.  My last day on the payroll will be April 8, 2019.
>
> . . . .
>
> I am proud to have had the honor to serve and lead the Kansas Highway [Patrol] for the past 30 years.  I wish the Agency and its employees nothing but the best in the future.

*Id.*

On January 27, 2020, plaintiff made a request under the Kansas Open Records Act, asking for a list of email accounts for all current KHP employees maintained @ks.gov.  *Id.* (Compl. ¶ 18).  The KHP provided the list to plaintiff in response to his request.  *Id.*

The State of Kansas owns and controls the email accounts for all current KHP employees that are maintained @ks.gov. *Id.* (Compl. ¶ 19). KHP employees primarily use these email accounts to conduct official business and interact with the public. *Id.* Also, "these emails accounts are open for, and compatible with, expressive activity." *Id.*

On April 3, 2020, plaintiff sent emails to six KHP employees at their email accounts maintained @ks.gov. *Id.* (Compl. ¶ 20). Most of the emails' recipients were management-level KHP employees, including Superintendent Jones. *Id.* In each of the emails, plaintiff discussed the KHP's past and present operations "including incidents of actual or potential wrongdoing, impropriety, or malfeasance." *Id.* Plaintiff's email to Superintendent Jones read:

> Since being appointed superintendent, you have consistently and constantly dishonored the position and the Patrol by engaging in unethical, immoral and illegal behavior. You have betrayed the oath of office and the badge you wear.

*Id.*

At the direction of Superintendent Jones, KHP's General Counsel, Luther L. Ganieany, Jr., sent an email to plaintiff's attorney. *Id.* at 6 (Compl. ¶ 21). Mr. Ganieany's email referred to the April 3, 2020 emails plaintiff had sent to KHP employees. *Id.* In relevant part, Mr. Ganieany's email provided:

> Such email communications from [plaintiff] directly with our employees is unwanted and disruptive to the working environment of the Patrol.
>
> As a precaution, we are in the process of requesting the email address he sent these emails from blocked by the Kansas Office of Information Technology Services in order to prevent further harassment of our employees. Additionally, please advise [plaintiff] that any further unsolicited communications of a similar nature from him and directed to employees of the Patrol will be considered harassment as defined by [Kan. Stat. Ann. §] 21-2606 and the appropriate referral will be made.

*Id.*

Around April 30, 2020, the Kansas Office of Information Technology blocked plaintiff from sending emails to the email accounts for all current KHP employees maintained @ks.gov. *Id.* (Compl. ¶ 22).  The Kansas Office of Information Technology took this action at the KHP's request and on the direction of Superintendent Jones.  *Id.*

On May 28, 2020, plaintiff sent a letter to Superintendent Jones.  *Id.* (Compl. ¶ 23).  It asked "'that the KHP take measures to allow [plaintiff] to freely communicate, by email, with all members of the agency[.]'"  *Id.*  On June 5, 2020, Mr. Ganieany, at Superintendent Jones's direction, sent a letter to plaintiff.  *Id.*  It read:  "'[T]his letter is to advise you that the block we have placed on email communications from [your email account] and addressed to official KHP email addresses will not be rescinded.'"  *Id.*  Plaintiff remains blocked from sending emails to email accounts for all current KHP employees maintained @ks.gov.  *Id.*

### III.     Legal Standard

#### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

Fed. R. Civ. P. 12(b)(1) permits a party to move the court to dismiss an action based on lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  And, Rule 12(h)(3) requires the court to dismiss an action if it "determines at any time that it lacks subject-matter jurisdiction."  Fed. R. Civ. P. 12(h)(3).

"Federal courts are courts of limited jurisdiction and, as such, must have a statutory basis to exercise jurisdiction."  *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) (citation omitted).  Sections 1331 and 1332 of Title 28 of the United States Code confer federal district courts with original jurisdiction over all civil actions arising under the constitution, laws, or treaties of the United States or where there is diversity of citizenship.  28 U.S.C. §§ 1331–32.  Since federal courts are courts of limited jurisdiction, the party invoking federal jurisdiction

bears the burden to prove it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Generally, a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) takes one of two forms: a facial attack or a factual attack. *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020). *First*, a "facial attack assumes the allegations in the complaint are true and argues they fail to establish jurisdiction." *Id.* (citations omitted). *Second*, a "factual attack goes beyond the allegations in the complaint and adduces evidence to contest jurisdiction. *Id.* (citations omitted). When considering a factual attack on subject matter jurisdiction "a district court has 'wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts.'" *Id.* (quoting *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001)). And, the "court's exercise of such discretion does not convert a Rule 12(b)(1) motion into a summary judgment motion unless 'resolution of the jurisdictional question is intertwined with the merits.'" *Id.* (quoting *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995)).

### B. Motion to Dismiss for Failure to State a Claim

Fed. R. Civ. P. 12(b)(6) allows a party to move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the factual allegations in the complaint are true but it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  And, although this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

**IV.    Analysis**

Plaintiff's Complaint asserts four claims:  (1) a 42 U.S.C. § 1983 claim against Governor Kelly for violating plaintiff's Fourteenth Amendment due process rights (Count I); (2) a 42 U.S.C. § 1983 claim against Chief of Staff Lawrence for violating plaintiff's Fourteenth Amendment due process rights (Count II); (3) a Kansas common law claim for tortious interference with prospective business relations against Chief of Staff Lawrence (Count III); and (4) a 42 U.S.C. § 1983 claim against Superintendent Jones for violating plaintiff's First Amendment free speech rights (Count IV).

Defendants ask the court to dismiss all four claims asserted by the Complaint.  They make six arguments supporting their motion.  They argue:  (1) the Eleventh Amendment bars any claims asserted against the State of Kansas and against individual defendants in their official capacities, and thus, the court must dismiss those claims for lack of subject matter jurisdiction; (2) the claims premised on plaintiff's assertion of a right under Kan. Stat. Ann. § 74-2113(a) to return to permanent status in the classified service as a Major in the KHP (Counts I, II, and III) are barred by res judicata and collateral estoppel; (3) Counts I, II, and III fail to state a plausible claim for relief because plaintiff did not have a property interest or prospective business

expectation in continued employment with the KHP; (4) defendant Lawrence is entitled to qualified immunity against Count II; (5) Count IV fails to state a plausible claim for relief because blocking emails to a government email system or government email address does not violate the First Amendment; and (6) Colonel Jones is entitled to qualified immunity against Count IV. The court addresses each argument, in turn, below.

## A. Eleventh Amendment Immunity

Defendants argue that Eleventh Amendment immunity bars the claims the Complaint asserts against defendants in their official capacities. *See* Doc. 1 at 2 (Compl. ¶¶ 5, 7) (asserting that plaintiff sues Governor Kelly only in her official capacity and Superintendent Jones both in his individual and official capacities). The Eleventh Amendment generally bars suits against states and their agencies based on their sovereign immunity. *Levy v. Kan. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1168 (10th Cir. 2015) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001))). Eleventh Amendment immunity also extends to suits seeking to recover money damages from state actors acting in their official capacities. *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997) ("It has long been settled that the [Eleventh Amendment's] reference to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities.").

But, the immunity conferred by the Eleventh Amendment "is not absolute." *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012). As our Circuit has explained, three exceptions exist to Eleventh Amendment immunity. *Id.* They are:

> First, a state may consent to suit in federal court. Second, Congress may abrogate
> a state's sovereign immunity by appropriate legislation when it acts under Section

5 of the Fourteenth Amendment.  Finally, under *Ex parte Young*, 209 U.S. 123 (1908), a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief.

*Id.* (further citations omitted).

The first two exceptions don't apply here.  *First*, Kansas hasn't waived its immunity. *Jones v. Courtney*, 466 F. App'x 696, 700 (10th Cir. 2012) (explaining that while "Kansas has consented to suit for damages under the Kansas Tort Claims Act[,]" it has not waived Eleventh Amendment immunity because the statute expressly disclaims a waiver (citing Kan. Stat. Ann. § 75-6116(g)) (further citations and internal quotation marks omitted)).  *Second*, Congress did not abrogate state sovereign immunity when it enacted 42 U.S.C. § 1983.  *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1195–96 (10th Cir. 1998) (citing *Quern v. Jordan*, 440 U.S. 332, 338–40 (1979)).

But, the *third* exception applies here, plaintiff argues.  The Supreme Court's *Ex Parte Young* decision "held that the Eleventh Amendment generally will not operate to bar suits so long as they (i) seek only declaratory and injunctive relief rather than monetary damages for alleged violations of federal law, and (ii) are aimed against state officers acting in their official capacities, rather than against the State itself."  *Hill v. Kemp*, 478 F.3d 1236, 1255–56 (10th Cir. 2007).  Plaintiff asserts that his claims against Governor Kelly and Superintendent Jones in their official capacities satisfy the *Ex Parte Young* criteria because:  (1) plaintiff's claims allege ongoing violations of federal law—*i.e.*, in the form of depriving plaintiff of his constitutional rights; *see* Doc. 1 at 7, 11–12 (Compl. ¶¶ 27, 49, 52); and (2) plaintiff asserts that he seeks prospective injunctive relief in the form of reinstatement of employment and an injunction ordering Superintendent Jones to remove the block placed against plaintiff sending emails to the email accounts of current KHP employees.  *Id.* at 8, 12 (Compl. ¶¶ 29, 52).  The court agrees that

13

these claims fall within the *Ex Parte Young* exception to Eleventh Amendment immunity. Thus, Eleventh Amendment immunity doesn't bar plaintiff's claims asserted against defendants acting in their official capacities based on alleged ongoing violations of federal law for which plaintiff seeks prospective injunction relief. But, to the extent one could construe plaintiff's claims as ones seeking money damages from state officials sued in their official capacities, the Eleventh Amendment bars those claims. *Ellis*, 163 F.3d at 1196.

### B. Res Judicata or Collateral Estoppel

Next, defendants assert that either res judicata or collateral estoppel—or both—bar plaintiff's claims based on his assertion of a right to return to permanent status in the classified service as a Major in the KHP. Each of plaintiff's Counts I, II, and III assert that defendants Governor Kelly and Chief of Staff Lawrence deprived plaintiff of a protected property interest and tortiously interfered with plaintiff's prospective business relations in continued employment with the KHP under Kan. Stat. Ann. § 74-2113(a). Doc. 1 at 7–8, 10 (Compl. ¶¶ 27, 33, 42–43). As relief for these alleged violations of constitutional and Kansas law, Count I seeks an order requiring plaintiff's reinstatement to his employment with the KHP at the rank of Major with permanent status, and Counts II and III seek money damages. *Id.* at 8–10 (Compl. ¶¶ 29, 36, 43).

Defendants assert that res judicata or collateral estoppel bar Counts I, II, and III because plaintiff already litigated these claims in his mandamus action filed with the Kansas Supreme Court. In plaintiff's mandamus action, he sought "a writ of mandamus, compelling the respondents [Governor Kelly and Superintendent Jones] to perform their clear legal duty under [Kan. Stat. Ann. §] 74-2113(a)." Doc. 11-1 at 2 (Pet. in Mandamus ¶ 5). And, plaintiff asked for "judgment against the respondents [Governor Kelly and Superintendent Jones] in the form of an order of mandamus, compelling the respondents to return [plaintiff] to his rank of Major, with

14

permanent status, in the classified service of" the KHP and for "judgment against the respondents in the form of an award of damages in excess of $10,000, consisting of lost salary and benefits, plus an award of attorney's fees." *Id.* at 6. The Kansas Supreme Court denied plaintiff's Petition for Writ of Mandamus after "[a]ssuming without deciding that there is any mandatory duty subject to control through a writ of mandamus" and concluding that "the undisputed facts indicate that [plaintiff] is not entitled to the relief sought because of his resignation." Doc. 11-4 at 1.

With this background, the court explains the law governing the doctrines of res judicata and collateral estoppel. Then, it turns to defendants' res judicata and collateral estoppel arguments against Counts I, II, and III.

### 1. Res Judicata

The full faith and credit provision of 28 U.S.C. § 1738 requires that federal courts "must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). The preclusive effect of a state court decision on an action filed in federal court is a matter of state law. *Weaver v. Boyles*, 172 F. Supp. 2d 1333, 1339 (D. Kan. 2001), *aff'd*, 26 F. App'x 908 (10th Cir. 2002) (citing *Heck v. Humphrey*, 512 U.S. 477, 480 n.2 (1994)). The court thus applies Kansas law to determine whether the Kansas Supreme Court's decision denying plaintiff's writ of mandamus precludes plaintiff's claims in this lawsuit based on res judicata. *See Migra*, 465 U.S. at 81 ("[T]he preclusive effect in federal court of [a] state-court judgment is determined by [state] law.").

"The doctrine of res judicata (or claim preclusion) prohibits a party from asserting in a second lawsuit any matter that might have been asserted in the first lawsuit." *Winkel v. Miller*,

205 P.3d 688, 697 (Kan. 2009) (citation and internal quotation marks omitted); *see also King v. Union Oil Co.*, 117 F.3d 443, 445 (10th Cir. 1997) ("Res judicata, or claim preclusion, precludes a party or its privies from relitigating issues that were or could have been raised in an earlier action, provided that the earlier action proceeded to a final judgment on the merits.").

"The doctrine of res judicata rests upon considerations of economy of judicial time and public policy which favors establishing certainty in judgments." *Neunzig v. Seaman Unified Sch. Dist. No. 345*, 722 P.2d 569, 576 (Kan. 1986); *see also Plotner v. AT & T Corp.*, 224 F.3d 1161, 1168 (10th Cir. 2000) ("The fundamental policies underlying the doctrine of res judicata (or claim preclusion) are finality, judicial economy, preventing repetitive litigation and forum-shopping, and the interest in bringing litigation to an end." (citations and internal quotation marks omitted)). Also, the "doctrine of res judicata expresses a policy designed to protect the defendant from harassment and the public from multiple litigation." *Griffith v. Stout Remodeling, Inc.*, 548 P.2d 1238, 1240 Syl. ¶ 7 (Kan. 1976). The Kansas Supreme Court has described the doctrine of res judicata this way:

> This rule is one of public policy. It is to the interest of the state that there be an end to litigation and an end to the hardship on a party being vexed more than once for the same cause. The doctrine of res judicata is, therefore, to be given a liberal application but not applied so rigidly as to defeat the ends of justice.

*In re Est. of Reed*, 693 P.2d 1156, 1160 (Kan. 1985) (citation omitted).

Under Kansas law, "[r]es judicata (claim preclusion) . . . contains four elements: (1) same claim; (2) same parties; (3) claims were or could have been raised; and (4) a final judgment on the merits." *Neunzig*, 722 P.2d at 575. An exception applies, though, "if the party seeking to avoid preclusion did not have a full and fair opportunity to litigate the claim in the prior suit." *Rhoten v. Dickson*, 223 P.3d 786, 797 (Kan. 2010). To establish that res judicata bars a

16

plaintiff's claims, a defendant bears the burden of presenting sufficient evidence to establish each element. *Spiess v. Meyers*, 483 F. Supp. 2d 1082, 1089 (D. Kan. 2007) (citation omitted).

### 2. Collateral estoppel

Collateral estoppel is a narrower version of res judicata. It "prevents a second litigation of the same issue between the same parties, even when raised in a different claim or cause of action." *In re Application of Fleet for Relief from a Tax Grievance*, 272 P.3d 583, 589 (Kan. 2012). Collateral estoppel has three required elements: "(1) a prior judgment on the merits that determined the parties' rights and liabilities on the issue based upon ultimate facts as disclosed by the pleadings and judgment; (2) the same parties or parties in privity; and (3) the issue litigated must have been determined and necessary to support the judgment." *Id.* at 589–90 (citing *Venters v. Sellers*, 261 P.3d 538, 547 (Kan. 2011)). Collateral estoppel will bar a § 1983 claim and give "binding effect to a state-court judgment or decision when the state court, acting within its proper jurisdiction, has given the parties a full and fair opportunity to litigate federal claims" because "no reason" exists "to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court[.]" *Allen v. McCurry*, 449 U.S. 90, 104 (1980).

### 3. Count I (§ 1983 Claim for Due Process Violation Against Governor Kelly)

The court declines to apply res judicata or collateral estoppel to bar plaintiff's claim in Count I for at least two reasons.

*First*, plaintiff's state court mandamus action didn't involve the same claim or same issues. Kansas courts determine whether an earlier lawsuit involved the same cause of action by applying a test that asks "whether the primary right and duty, and delict or wrong, are the same in each action." *Wells v. Ross*, 465 P.2d 966, 968 (Kan. 1970) (citation and internal quotation

17

marks omitted).  "Under this test, there is but one cause of action when there is but one right in the plaintiff and one wrong on the part of the defendant involving that right."  *Id.* (citation and internal quotation marks omitted).  Also, Kansas courts recognize that a "cause of action arises from the wrong done and not from the character of relief sought or from the measure of compensation."  *Thompson-Hayward Chem. Co. v. Cyprus Mines Corp.*, 660 P.2d 973, 977 (Kan. Ct. App. 1983) (citing *Burnison v. Fry*, 428 P.2d 809, 813 (Kan. 1967)).

Here, plaintiff's state court mandamus action sought "a writ of mandamus, compelling the respondents [Governor Kelly and Superintendent Jones] to perform their clear legal duty under [Kan. Stat. Ann. §] 74-2113(a)."  Doc. 11-1 at 2 (Pet. in Mandamus ¶ 5).  Plaintiff argued that Kan. Stat. Ann. § 74-2113(a) "imposes a clear legal duty on Governor Kelly and Acting Superintendent Jones to return [plaintiff] to his rank of Major in the classified service" of KHP. *Id.* at 5 (Pet. in Mandamus ¶ 19).  And thus, he asked the Kansas Supreme Court to issue "an order of mandamus . . . to Governor Kelly and Acting Superintendent Jones, compelling them to return [plaintiff] to his rank of Major, with permanent status, in the classified service of" KHP. *Id.*  The Kansas Supreme Court denied plaintiff's Petition for Writ of Mandamus after "[a]ssuming without deciding that there is any mandatory duty subject to control through a writ of mandamus" and concluding that "the undisputed facts indicate that [plaintiff] is not entitled to the relief sought because of his resignation."  Doc. 11-4 at 1.  Thus, the primary right at issue in the state mandamus action was plaintiff's right under Kan. Stat. Ann. § 74-2113(a) to return to the rank of Major, with permanent status, in the classified service of KHP.  And, the primary wrong alleged was Governor Kelly and Superintendent Jones's failure to perform their statutory duty under Kan. Stat. Ann. § 74-2113(a).

18

In contrast, Count I in the current lawsuit asserts a claim under § 1983, alleging that Governor Kelly, acting under color of state law, violated plaintiff's Fourteenth Amendment rights by depriving him of a property interest without due process of the law by failing to return plaintiff to the rank of Major with permanent status in KHP.  Doc. 1 at 7 (Compl. ¶¶ 26–27).  So, the primary right at issue in Count I is plaintiff's constitutional right to due process guaranteed by the Fourteenth Amendment.  And the primary alleged wrong is Governor Kelly violating plaintiff's constitutional rights under color of state law.

Both plaintiff's mandamus action and Count I's § 1983 claim arise out of the same subject matter—Governor Kelly's failure to return plaintiff to the rank of Major with permanent status in the classified service of the KHP.  But, applying Kansas's primary rights test, the two causes of action don't share the same identity.  "The primary rights at issue in the two actions are different, as are the wrongs alleged."  *World Ent. Servs., Kan., L.P. v. Evans*, No. 90-2041-O, 1991 WL 183558, at *3 (D. Kan. Aug. 19, 1991) (holding that res judicata did not bar plaintiff's § 1983 claim which arose "out of the same factual circumstance" at issue in a state mandamus proceeding because the primary right at issue in the mandamus action, and the wrong alleged in that action, differed from those asserted in the § 1983 lawsuit).

Defendants argue that plaintiff's mandamus action shares an "identify in the things sued for" in this lawsuit because plaintiff alleged "in the prior action that he was deprived of a property interest[.]"  Doc. 21 at 4.  That's not an accurate description of the state mandamus action.  Plaintiff's mandamus action never alleged that Governor Kelly deprived him of a property interest or violated his constitutional right to due process.  *See generally* Docs. 11-1 & 11-2.  Instead, plaintiff argued that Governor Kelly failed to perform her statutory duty under Kan. Stat. Ann. § 74-2113(a).  Doc. 11-1 at 5 (Pet. in Mandamus ¶¶ 18–20); Doc. 11-2 at 5–6.

19

The state mandamus proceeding never litigated or decided the constitutional issues that Count I asserts in this case. So, the court finds, plaintiff's state mandamus action didn't involve the same claim or issues that Count I asserts in this lawsuit. Thus, neither res judicata nor collateral estoppel bar Count I's § 1983 claim alleging due process violations.

*Second*, defendants haven't established whether plaintiff had "a full and fair opportunity to litigate" Count I's § 1983 claim in the state mandamus action. *Rhoten v. Dickson*, 223 P.3d 786, 797 (Kan. 2010). The Kansas Supreme Court has described mandamus as "an extraordinary remedy . . . available only in rare cases, and as a last resort, for causes which are really extraordinary." *State ex rel. Stephan v. O'Keefe*, 686 P.2d 171, 176 (Kan. 1984). "The only acts of public functionaries which the court ever attempts to control by . . . mandamus are such acts which are by their nature strictly ministerial[,]" that is, "one which a public officer or agent is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning the propriety or impropriety of the act to be performed." *Id.* at 177.

Defendants never explain whether Kansas law permits a plaintiff to join federal constitutional claims in a state mandamus action. The Kansas statutes provide that "mandamus shall be obtained under the same procedure as relief in other civil actions" and permit a plaintiff to "combine . . . an application for [injunctive] relief" seeking a "stay [of] any proceedings or acts pending determination of the mandamus proceeding[.]" Kan. Stat. Ann. § 60-802(a). But, the statute doesn't state explicitly whether a plaintiff may join other civil claims in a mandamus proceeding. *Cf. Jarrett v. Gramling*, 841 F.2d 354, 357 (10th Cir. 1988) (explaining that Oklahoma's "mandamus provisions, viewed together with Oklahoma's joinder rules and the background of this case, clearly indicate that plaintiff could have asserted his § 1983 claims in

the mandamus action, that plaintiff had a full and fair opportunity to litigate the claims, and that

the state court had authority to adjudicate the merits of the claims" so the court applied res

judicata to bar plaintiff's § 1983 claim). Based on the scant information provided by defendants'

briefing, defendants haven't discharged their burden to show that plaintiff had a full and fair

opportunity to litigate his § 1983 claims or the issue whether he had a constitutionally protected

property interest in continued employment with the KHP in the state mandamus proceedings.

On these facts, defendants haven't shouldered their burden to show that res judicata or

collateral estoppel bar plaintiff's Count I. *See Spiess v. Meyers*, 483 F. Supp. 2d 1082, 1089 (D.

Kan. 2007) (explaining that to "invoke res judicata" properly, defendants "bear the burden of

presenting sufficient evidence on" each element (citation omitted)); *see also id.* at 1090

(requiring that defendants must show the four required elements of collateral estoppel to "invoke

collateral estoppel" properly). So, the court declines to apply either res judicata or collateral

estoppel to bar Count I in this lawsuit.

### 4. Counts II & III (§ 1983 & Tortious Inference Claim Asserted Against Chief of Staff Lawrence in his Individual Capacity)

The court also declines to apply res judicata or collateral estoppel to plaintiff's Count II

and III. The court won't apply these doctrines to Count II—alleging a § 1983 claim against

Chief of Staff Lawrence—for the same reasons it can't apply res judicata or collateral estoppel

against Count I. That is, defendants haven't shown that the state mandamus proceedings

involved the same claims or same issues presented by plaintiff's § 1983 claims. Also,

defendants haven't shown that plaintiff had a full and fair opportunity to litigate the § 1983

claims in the state mandamus proceeding. So, res judicata and collateral estoppel don't bar

Count II.

Also, these doctrines don't apply to bar Counts II and III because defendants can't show that Chief of Staff Lawrence was the same party or in privity with the parties sued in the state mandamus action.  In this lawsuit, plaintiff asserts both Counts II and III against Chief of Staff Lawrence in his individual capacity.  *See* Doc. 1 at 2 (Compl. ¶ 6) (asserting that Chief of Staff Lawrence "is being sued only in his personal or individual capacity"); *see also id.* at 9 (asserting Count II against "Mr. Lawrence, in his individual capacity"); *see also id.* at 10 (asserting Count III against "Mr. Lawrence, in his personal capacity").  Although Kansas courts haven't decided whether a governmental employee sued in his individual capacity is in privity with his governmental employer, the Tenth Circuit and our court have held many times that governmental employees sued in their individual capacity are not in privity with their governmental employer. *See, e.g.*, *Gonzales v. Hernandez*, 175 F.3d 1202, 1206 (10th Cir. 1999) ("The general weight of authority appears to be that while government employees are in privity with their employer [when sued] in their official capacities, *they are not in privity [when sued] in their individual capacities*." (emphasis added)); *Spiess v. Meyers*, 483 F. Supp. 2d 1082, 1089–90 (D. Kan. 2007) (holding that individual defendants were not in privity with parties to the earlier litigation—*i.e.*, the State of Kansas and its agencies—because plaintiff asserted his claims against the defendants in their individual capacities); *Brooks v. Graber*, No. 00-2262-DES, 2000 WL 1679420, at *5 (D. Kan. Nov. 6, 2000) (explaining that "the Tenth Circuit has made [it] clear that governmental employees sued in their individual capacity [can't] claim res judicata effect to former suits brought against their governmental employer").

In *Cosgrove v. Kansas Department of Social and Rehabilitative Services*, Judge Crow considered whether res judicata applied to bar a plaintiff's individual capacity claims against four individuals where plaintiff earlier had filed a similar state court lawsuit against these

individuals, suing them in their official capacities. 744 F. Supp. 2d 1178, 1185 (D. Kan. 2010). Judge Crow recognized, "Kansas has not addressed this rule or applied it in the context of res judicata." *Id.* And other courts have reached conflicting results. *Id.* But, "[i]n an abundance of caution, the court assume[d] that the Kansas Supreme Court may apply the rule of differing capacities." *Id.* The court recognized that the individual defendants "merely served as representatives of the government when sued previously in their official capacities and have different defenses available to them in a personal-capacity action than [they do] in an official-capacity action[.]" *Id.* So, Judge Crow reasoned, the individual defendants "did not represent precisely the same legal right as they now do." *Id.* Judge Crow thus held that res judicata did not bar plaintiff's current suit against the four individuals in their individual capacities. *Id.*

The same reasoning applies to Counts II and III here. They assert claims against Chief of Staff Lawrence only in his individual capacity. The parties to the state court mandamus action—Governor Kelly and Superintendent Jones— "did not represent precisely the same legal right as" Chief of Staff Lawrence does now in his individual capacity. *Id.* The court finds Judge Crow's reasoning persuasive, and here it reaches the same conclusion he reached in *Cosgrove.* The court predicts that, if presented with this issue, the Kansas Supreme Court would come to the same conclusion and hold that governmental employees sued in their individual capacity are not in privity with their governmental employer.

Thus, neither res judicata nor collateral estoppel bar Counts II or III because plaintiff asserts them against Chief of Staff Lawrence in his individual capacity. Chief of Staff Lawrence, in his individual capacity, is not the same party or in privity with the parties plaintiff sued in his state mandamus proceeding. So, res judicata and collateral estoppel don't apply to Count II and III's individual capacity claims asserted against Chief of Staff Lawrence. *See Neunzig*, 722 P.2d

at 575 (explaining that one of Kansas's four requirements for res judicata is "same parties"); *see also Jetcraft Corp. v. FlightSafety Int'l, Inc.*, 781 F. Supp. 687, 692–693 (D. Kan. 1991) (noting that "the Kansas Supreme Court has consistently required, as a prerequisite to the use of collateral estoppel, that the parties of the subsequent litigation be identical to or in privity with parties in the earlier action."); *In re Application of Fleet for Relief from a Tax Grievance*, 272 P.3d at 589–90 (listing as one of Kansas's three required elements for collateral estoppel: "the same parties or parties in privity" (citation omitted)).

### C.  Counts I, II, and III

Defendants next argue that even if res judicata and collateral estoppel don't bar the claims asserted in Counts I, II, and III, the court should dismiss them because they fail to state a plausible claim for relief.  Defendants contend that plaintiff hasn't stated a § 1983 claim for due process violations or a Kansas tortious interference claim because he had no protected property interest or prospective business expectancy with the KHP sufficient to support any of the claims in Counts I, II, or III.  The court addresses the due process and tortious interference claims, separately, below.

#### 1.  Due Process (Counts I & II)

Counts I and II assert that Governor Kelly and Chief of Staff Lawrence violated § 1983 and the Fourteenth Amendment by depriving plaintiff of a property interest without due process of law.  Doc. 1 at 7–9 (Compl. ¶¶ 27, 33–34).  Our Circuit has explained that "'[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment.'"  *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)).  A procedural due process violation requires a two-step

24

inquiry: (1) "whether the plaintiff had a constitutionally protected interest[,]" and (2) "whether the process afforded was adequate to protect that interest." *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 748 (10th Cir. 2013) (citation omitted).

The first requirement—the existence of a constitutionally protected property interest— "does not arise from the Due Process Clause itself[.]" *Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1172–73 (10th Cir. 2016) (citation omitted). Instead, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *see also Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996) ("The question whether a plaintiff had a protected property interest is determined by state law." (citing *Casias v. City of Raton*, 738 F.2d 392, 394 (10th Cir. 1984))). Thus, for "purposes of the Fourteenth Amendment's Due Process Clause, property interests must derive from some independent source, such as state law, contract, or other understandings that give rise to a claim of entitlement." *Eisenhour v. Weber Cnty.*, 744 F.3d 1220, 1232 (10th Cir. 2014) (citing *Roth*, 408 U.S. at 577).

Also, when "a plaintiff claims a property interest in [his] job," the court must determine whether plaintiff "had 'a legitimate expectation of continued employment,' as defined by some independent source such as a contract for a fixed term or state law." *Id.* (quoting *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998)); *see also McDonald v. Wise*, 769 F.3d 1202, 1210 (10th Cir. 2014) ("A public employee has a property interest in his continued employment where 'state or local law creates a sufficient expectancy of continued employment.'" (quoting *Driggins v. City of Okla. City, Okla.*, 954 F.2d 1511, 1513 (10th Cir. 1992))). Thus, "[s]tate law

determines whether a claim of entitlement to employment is sufficient." *McDonald*, 769 F.3d at

1210 (citing *Driggins*, 954 F.2d at 1513).

Defendants assert that plaintiff fails the first element of the due process inquiry.  That is,

they contend, plaintiff fails to allege a protected property interest in continued employment with

the KHP sufficient to state a plausible § 1983 claim based on a due process violation.  As the

case law directs, the court must examine state law to determine whether it provided a property

interest in continued employment with the KHP.  The court thus proceeds to analyze this issue

under the statutory text and history of Kan. Stat. Ann. § 74-2113.

The current version of subsection (a) of that statute provides:

> There is hereby created a Kansas highway patrol.  The patrol shall consist of:  (1)
> A superintendent, who shall have the rank of colonel and who shall have special
> training and qualifications for the position; (2) an assistant superintendent, who
> shall have the rank of lieutenant colonel; and (3) officers and troopers who are
> appointed in accordance with appropriation acts and as provided in this section.
> *The superintendent and assistant superintendent shall be within the unclassified*
> *service under the Kansas civil service act.*  The assistant superintendent shall be
> appointed by the superintendent from among the members of the patrol, and shall
> serve at the pleasure of the superintendent.  *If a person appointed as superintendent,*
> *assistant superintendent or major is a member of the patrol when appointed, the*
> *person in each case, upon termination of the term as superintendent, assistant*
> *superintendent or major, respectively, shall be returned to a rank not lower than*
> *the rank the person held when appointed as superintendent, assistant*
> *superintendent or major.*  If the rank is filled at that time, a temporary additional
> position shall be created in the rank until a vacancy occurs in such rank.  *All other*
> *officers, troopers and employees shall be within the classified service under the*
> *Kansas civil service act.*

Kan. Stat. Ann. § 74-2113(a) (emphasis added).

The pertinent Kansas statute divides "civil service of the state of Kansas into two

categories:  the unclassified and the classified services."  Kan. Stat. Ann. § 75-2935.  "The

unclassified service comprises positions held by state officers or employees who are . . . if

designated by the appointing authority, persons in newly hired positions, including any employee

who is rehired into such position and any current state employee who voluntarily transfers into, or is voluntarily promoted or demoted into such position, on and after July 1, 2015, in any state agency[.]" *Id.* § 75-2935(1)(x). "The classified service comprises all positions now existing or hereafter created which are not included in the unclassified service." *Id.* § 75-2935(2).

The Kansas statutes provide certain pre- and post-termination protections for classified employees. *See* Kan. Stat. Ann. § 75-2949 (requiring certain procedures for a dismissal, demotion, or suspension of a classified employee including granting the employee a right to request a hearing to determine the reasonableness of the employment action). The Kansas statutes contain no similar protections for unclassified employees. Instead, unclassified employees are "essentially 'at will' employees who serve at the discretion of their appointing authority[.]" *Platt v. Kan. State Univ.*, No. 110,179, 337 P.3d 73, 2014 WL 6090403, at *6 (Kan. Ct. App. Nov. 3, 2014) (unpublished table opinion); *see also Befort v. Dep't of Com.*, No. 08-2598-KHV, 2009 WL 10707844, at *2 (D. Kan. Dec. 17, 2009) (explaining that the Kansas Civil Service Act "provides job protections to classified employees" that include "the right to grieve adverse employment actions, suspensions, demotions and terminations to the civil service board" but "[b]y contrast, unclassified employees are at-will employees" (citing Kan. Stat. Ann. §§ 75-2925–75-2975)).

As our Circuit has explained, an at-will employee has no protected property interest entitled to protection under the Fourteenth Amendment. *See Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1136 (10th Cir. 1994) (explaining that a "public employee terminable at-will does not possess a protected property interest under Kansas law for purposes of procedural due process analysis"); *see also Washington v. Unified Gov't of Wyandotte Cnty., Kan.*, 847 F.3d 1192, 1201–02 (10th Cir. 2017) (affirming summary judgment against due process claim because

at-will employee had no protected property interest in his employment); *Darr v. Town of Telluride, Colo.*, 495 F.3d 1243, 1252 (10th Cir. 2007) ("At-will employees lack a property interest in continued employment." (citing *Bishop v. Wood*, 426 U.S. 341, 345 n.8, 345–47 (1976))). So, the viability of plaintiff's § 1983 claims hinges on the question whether he had a constitutionally protected property interest in continued employment as Major in the KHP.

Defendants argue that the Kansas statutes conferred no constitutionally protected property interest on plaintiff for three reasons. *First*, defendants assert that the rank of Major is an unclassified position under the Kansas statutes. Doc. 11 at 24–26. Thus, defendants argue, plaintiff had no constitutionally protected property interest in the rank of Major because that position is an at-will employment position that is terminable at any time for any reason. *Id. Second*, defendants argue that, even the rank of Major is an unclassified position under the Kansas statutes, demotion into a classified position from the unclassified service requires a mandatory six-month probationary period. *Id.* at 26–28. Thus, defendants contend, plaintiff had no constitutionally protected property interest in the rank of Major because his employment in that position requires him to serve as an at-will employee for a six-month probationary period. *Third*, defendants argue that the Kansas statutes conferred no constitutionally protected property interest in his continued employment because he resigned—and was not terminated—from his position as Superintendent. *Id.* at 28–29.

The court begins its analysis by addressing defendants' third argument. As explained, the court concludes that plaintiff has alleged facts from which a reasonable trier of fact could find or infer that plaintiff did not resign voluntarily from his Superintendent position. Instead, plaintiff has alleged facts that, if true, could support a plausible inference that he was constructively

discharged. So, the court won't dismiss plaintiff's § 1983 due process claims for this third reason.

Then, the court turns to defendants' first and second arguments. These arguments require the court to determine whether the Kansas statutes conferred on plaintiff the right to return to the rank of Major in the classified service. Unfortunately, the court can't decide this question without further guidance on this issue of Kansas law. The plain language of the statute provides no definite answer. And, the parties (and the court) have located no case law interpreting this statute in a way that could guide the court's analysis of the question. So, as explained below, the court certifies two questions to the Kansas Supreme Court so that it can decide this unsettled and dispositive issue.

> ### a. Does Kan. Stat. Ann. § 74-2113 prohibit plaintiff from asserting a constitutionally protected property interest in continued employment because he resigned as Superintendent and wasn't terminated from the position?

Defendants argue that Kan. Stat. Ann. § 74-2113 conferred no protected property interest on plaintiff because that statute applies only "upon *termination* of the term as superintendent[.]" Kan. Stat. Ann. § 74-2113(a) (emphasis added). Here, defendants argue, plaintiff never alleges that Governor Kelly terminated him from his position as KHP Superintendent. Instead, he alleges that he resigned from that position. Doc. 1 at 3 (Compl. ¶ 14) (alleging plaintiff "told Mr. Lawrence that he would resign").

Plaintiff disagrees. He concedes that he resigned from the Superintendent position, but he alleges that his retirement from the KHP was "involuntary because it was caused by duress or coercion." Doc. 1 at 7 (Compl. ¶ 28). Also, he alleges that he "understood and believed that he was being dismissed from all employment with the KHP" and also "understood and believed that he had no other choice but to retire from KHP." *Id.* at 4 (Compl. ¶ 16). Thus, plaintiff contends,

29

his resignation actually was a constructive discharge depriving him of a protected property interest.

Our Circuit has explained that if an employee's resignation "was so involuntary it amounted to a constructive discharge, defendants did deprive [him] of [his] property interest without due process." *Parker v. Bd. of Regents of Tulsa Junior Coll.*, 981 F.2d 1159, 1162 (10th Cir. 1992) (citing *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1988)). "A resignation will be involuntary and coerced when the totality of the circumstances indicate the employee did not have the opportunity to make a free choice." *Id.* (citing *Stone*, 855 F.2d at 174 (further citation omitted)). The Circuit has articulated four factors that a court should consider when deciding whether a resignation was an involuntary constructive discharge:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation.

*Id.* (citing *Stone*, 855 F.2d at 174 (further citation omitted)). "Although these four factors are not necessarily determinative when there is no explicit forced choice between resignation and termination, they are nonetheless informative." *Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 566 (10th Cir. 2010) (citation omitted).

Here, plaintiff alleges facts—accepted as true because the governing procedural rules so require—from which a reasonable factfinder could infer that plaintiff's resignation was so involuntary that it amounted to a constructive discharge under the four factors articulated by *Parker*.

*First*, plaintiff alleges that Chief of Staff Lawrence told him "that 'we need you to resign'" from the position of Superintendent. Doc. 1 at 3 (Comp. ¶ 14). Plaintiff never alleges that Chief of Staff Lawrence gave him any alternative to resigning. And, plaintiff alleges, based

on his meeting with Chief of Staff Lawrence, he "understood and believed that he was being dismissed from all employment with the KHP" and "that he had no other choice but to retire from the KHP." *Id.* at 4 (Compl. ¶ 16).

*Second*, plaintiff alleges that the nature of the choice was that he didn't think he had any choice. As just stated, he asserts that he "understood and believed that he had no other choice but to retire from the KHP." *Id.*

*Third*, plaintiff's Complaint doesn't allege anything about the amount of time he was provided to make his decision about resigning. But, he alleges that Chief of Staff Lawrence handed him a prepared resignation letter during their March 28 meeting, which plaintiff signed. *Id.* at 3 (Compl. ¶ 14). With this letter, plaintiff just resigned from his position as Superintendent—not from his employment with the KHP. *Id.* But, plaintiff alleges, based on his conversation with Chief of Staff Lawrence and the language of the March 28 letter Chief of Staff Lawrence provided to him, that he "understood and believed that he was being dismissed from all employment with the KHP." *Id.* at 4 (Compl. ¶ 16).

*Fourth*, plaintiff never alleges specifically whether he was permitted to select his resignation date. But, he asserts that the prepared resignation letter that Chief of Staff Lawrence presented to him for his signature included a resignation date of April 6, 2019. *Id.* at 3 (Compl. ¶ 13). And, the prepared letter that Chief of Staff Lawrence signed and provided to plaintiff also included an April 6, 2019 resignation date. *Id.* at 4 (Compl. ¶ 15). Also, plaintiff alleges, based on his conversation with and the letter from Chief of Staff Lawrence, he "understood and believed that he was being dismissed from all employment with the KHP" and "that he had no other choice but to retire from the KHP." *Id.* (Compl. ¶ 16).

31

Assuming plaintiff can prove his allegations in light of these four factors, a reasonable factfinder could find or infer that plaintiff was constructively discharged from the Superintendent position. Thus, plaintiff plausibly has alleged that Kan. Stat. Ann. § 74-2113 applies here.  As already stated, that statute is triggered "upon *termination* of the term as superintendent[.]"  Kan. Stat. Ann. § 74-2113(a) (emphasis added).  Even though plaintiff alleges he resigned from the Superintendent position, he also alleges facts supporting a plausible inference that plaintiff's resignation was coerced and involuntary such that it amounted to a termination from the Superintendent position.  Thus, the court declines to dismiss plaintiff's § 1983 claims based on defendants' argument that Kan. Stat. Ann. § 74-2113(a) conferred no constitutionally protected property interest on plaintiff because his employment as Superintendent ended with his resignation instead of a termination.

### b.  Does Kan. Stat. Ann. § 74-2113 confer a right on plaintiff to employment at the rank of Major with permanent status in the classified service?

Next, defendants argue that plaintiff had no constitutionally protected property interest in returning to his previous rank of Major because, defendants contend, Kan. Stat. Ann. § 74-2113 places the rank of Major in the unclassified service.  And, because the Kansas statute identifies the rank of Major as an unclassified position, defendants assert that the rank of Major is an at-will employment position, meaning that it confers no protected property interest in continued employment on an employee holding that rank.  *See Hesse v. Town of Jackson, Wyo.*, 541 F.3d 1240, 1245 (10th Cir. 2008) (explaining that, under Wyoming law, "a Wyoming public employee whose employer may fire him at will for any reason or for no reason at all does not possess a property interest in continued public employment").  So, defendants argue, plaintiff

had no constitutionally protected property interest in employment at the rank of Major. And, as a consequence, plaintiffs' § 1983 claims fail as a matter of law, defendants contend.

Plaintiff reads the Kansas statute differently. He asserts that he had a protected property interest in "continued employment by the KHP" and was "entitled to be returned to *permanent status in the classified service* as a Major in the KHP."[4] Doc. 1 at 7 (Compl. ¶ 26) (emphasis added); *see also id.* at 8 (Compl. ¶ 32). He contends that Kan. Stat. Ann. § 74-2113(a) confers this right because it provides: "If a person appointed as superintendent . . . is a member of the patrol when appointed . . . upon termination of the term as superintendent" the person "shall be returned to a rank not lower than the rank the person held when appointed as superintendent[.]" Kan. Stat. Ann. § 74-2113(a).

The court agrees that this portion of the statute confers on a Superintendent—who is terminated from that position—the right to return to his previous rank in the KHP. So, the statute conferred on plaintiff the right to return to his previous rank of Major. But nothing in the statute confers a right on a terminated Superintendent to employment as a classified employee with permanent status—as plaintiff contends.[5] So, the court must decide whether the Kansas

---

[4]     Plaintiff never argues he had a protected property interest in continued employment as the KHP Superintendent. To the contrary, his Complaint recognizes that he served "as the Superintendent of the KHP, at the pleasure of the governor." Doc. 1 at 3 (Compl. ¶ 12); *see also Stoldt v. City of Toronto*, 678 P.2d 153, 160 (Kan. 1984) (explaining that "the tenure of any office not provided for in the [Kansas] constitution may be declared by statute, and when not so declared such office shall be held at the pleasure of the appointing authority" and, in Kansas, "the incumbent to a public office enjoys *no property or vested interest* in public office" (citation and internal quotation marks omitted)).

[5]     Plaintiff offers two other arguments that the court rejects. *First*, plaintiff contends he is entitled to return to permanent status as a classified employee in the position of Major because he held that status before Governor Brownback appointed him to KHP Superintendent. *See* Doc. 1 at 3 (Compl. ¶ 11) (alleging that, in 2008, plaintiff was promoted to the position of Major, and, after serving a probationary period, "attained permanent status as a Major in the classified service"). Defendants respond that plaintiff surrendered his classified status when he accepted the unclassified position as KHP Superintendent in 2015. Defendants explain that the Kansas Administrative Regulations explicitly permit a classified employee to retain that employment status by taking a leave of absence from a classified position to take a position in the unclassified service. *See* Kan. Admin. Regs. § 1-9-6(e) ("Any employee with permanent

statute categorizes the rank of Major as a classified or unclassified position in the Kansas civil service.

Before plaintiff resigned as Superintendent in 2019, the Kansas legislature had amended Kan. Stat. Ann. § 74-2113. Among other changes, the 2018 amendment changed two of the last three sentences of subsection (a). Specifically, the Kansas legislature added the words shown in bold, below, and deleted the words shown in strike through format:

> If a person appointed as superintendent ~~or,~~ assistant superintendent **or major** is a member of the patrol when appointed, ~~such~~ **the** person in each case, upon termination of the term as superintendent ~~or,~~ assistant superintendent **or major**, respectively, shall be returned to a rank not lower than the rank ~~such~~ **the** person held when appointed as superintendent ~~or,~~ assistant superintendent **or major**. If ~~such~~ **the** rank is filled at that time, a temporary additional position shall be created in ~~such~~ **the** rank until a vacancy occurs in such rank. All other officers, troopers and employees shall be within the classified service under the Kansas civil service act.

status may be granted leave of absence without pay from the employee's classified position to enable the employee to take a position in the unclassified service, if the granting of this leave is considered by the appointing authority to be in the best interest of the service. Leave for this purpose shall not exceed one year, but the appointing authority may grant one or more extensions of up to one year, and the appointing authority may determine the number of extensions."). But, plaintiff's Complaint never alleges that the appointing authority granted him a leave of absence from his prior classified position with permanent status. Nor does he allege that the appointing authority has granted him extensions of a leave of absence since he assumed the Superintendent position in 2015. Absent any allegations about a leave of absence from a classified position, plaintiff lost his status as a classified employee with permanent status when he accepted the unclassified position of KHP Superintendent. And, Kan. Stat. Ann. § 74-2113(a) provides him no right to return to a classified position with permanent status simply because he previously held that status.

*Second*, plaintiff argues that his interpretation of Kan. Stat. Ann. § 74-2113(a) is consistent with the way that the KHP has applied it in the past. Relying on assertions in the Declaration plaintiff attached to his Opposition to defendants' motion, plaintiff contends that, in 1983, a former KHP Superintendent's appointment terminated, and then the former Superintendent returned to his former rank of Major with permanent status in the classified service. *See* Doc. 15 at 17 (citing Doc. 15-1 at 2). As already discussed, the court won't consider plaintiff's Declaration because it's a matter outside the pleadings that the court can't consider on a motion to dismiss. But, even if the Complaint contained the declarations about the former KHP Superintendent as factual allegations, the facts involving this person's employment occurred long before the 2018 amendments to Kan. Stat. Ann. § 74-2113(a). So, even if the Complaint made these allegations, they wouldn't provide any guidance to the court when interpreting the Kansas statute at issue because an earlier version of Kan. Stat. Ann. § 74-2113(a) would have applied to the former KHP Superintendent's termination in 1983.

Act of Mar. 29, 2018, ch. 18., sec. 1, § 74-2113(a), 2018 Kan. Sess. Laws 90–91 (2018) (explaining "Additions are indicated by **Text**; deletions by ~~Text~~").

Defendants argue that the Kansas legislature amended this statute in 2018 in response to KHP moving the rank of Major from a classified position to an unclassified position. And, defendants contend, the legislature codified this amendment to provide Majors the same protections afforded other members of the unclassified service—*i.e.*, the KHP Superintendent and Assistant Superintendent.

Defendants rely on the language that the Kansas legislature added to the statute to support their argument that the 2018 amendments gave those serving at the rank of Major in the KHP a right to return to the classified service should the KHP Superintendent terminate a Major's status as a Major. Kan. Stat. Ann. § 74-2113(a) ("If a person appointed as superintendent, assistant superintendent *or major* is a member of the patrol when appointed, the person in each case, upon termination of the term as superintendent, assistant superintendent *or major*, respectively, shall be returned to a rank not lower than the rank the person held when appointed as superintendent, assistant superintendent *or major*." (emphasis added)). As a consequence, defendants argue, the statute excludes Majors from classified service because, after describing the procedure for returning a Major to his or her previous rank, the statute says "[a]ll other officers, troopers, employees shall be within the classified service under the Kansas civil service act." Kan. Stat. Ann. § 74-2113(a).

Plaintiff reads the statute differently. He cites the third sentence of § 74-2113(a), which reads: "The superintendent and assistant superintendent shall be within the unclassified service under the Kansas civil service act." Plaintiff argues that this sentence categorizes only the Superintendent and Assistant Superintendent as unclassified employees. Thus, plaintiff argues,

the omission of Majors from this sentence shows that the Kansas legislature never intended to include Majors in the unclassified service. And thus, the rank of Major is a position in the classified service.

In Kansas, "interpretation of a statute is a question of law, and it is the function of the court to interpret a statute to give it the effect intended by the legislature." *Finstad v. Washburn Univ.*, 845 P.2d 685, 690 (Kan. 1993) (citation omitted). The court "should give words in common usage their natural and ordinary meaning" when construing the statute's language. *Id.* (citation and internal quotation marks omitted); *see also State v. Marks*, 490 P.3d 1160, 1163 (Kan. 2021) (instructing that courts, when interpreting Kansas statutes, must "examine the language of the provision and apply plain and unambiguous language as written" (citation and internal quotation marks omitted)). Also, to determine the legislative intent of the statute, the court may "look to the purpose to be accomplished and the effect the statute may have under the various constructions suggested." *Finstad*, 845 P.2d at 690 (citation omitted).

Here, the court must interpret a statute that wasn't drafted in a clear and consistent fashion. Each side of the caption presents a compelling argument why the plain language of the statute favors the competing constructions that each side proposes.

Plaintiff argues that Majors aren't part of the unclassified service because the statute only identifies the Superintendent and Assistant Superintendent "within the unclassified service under the Kansas civil service act." Kan. Stat. Ann. § 74-2113(a). The Kansas Supreme Court recognizes the rule of *expressio unius est exclusio alterius*, which requires a court to "presume that when the legislature expressly includes specific terms, it intends to exclude any items not expressly included in the specific list." *In re Marriage of Killman*, 955 P.2d 1228, 1234 (Kan. 1998) (citing *State v. Wood*, 647 P.2d 1327, 1330 (Kan. 1982)). When the Kansas legislature

amended Kan. Stat. Ann. § 74-2113(a) in 2018, it never amended the third sentence of the statute that specifically identifies Superintendents and Assistant Superintendents as positions within the unclassified service. If the legislature had intended for Majors also to fall within the unclassified service, it easily could have included Majors in this third sentence in the amended statutory language. But it didn't. Thus, this omission arguably manifests a legislative intent to exclude Majors from the unclassified service under the rule of *expressio unius est exclusio alterius*.

At the same time, this sentence identifying only Superintendents and Assistant Superintendents is near the beginning of § 74-2113's subsection (a). It is part of a group of sentences that describe the rank and appointment of the Superintendent and Assistant Superintendent. None of these sentences discuss the role of a KHP Major. So, to conclude that this sentence means that the Superintendent and Assistant Superintendent of KHP are the only unclassified positions in the KHP ignores the context of this particular sentence. And, it ignores the remaining language of subsection (a), which—as discussed below—suggests that the Kansas legislature intended to exclude Majors from the classified service.

So, plaintiff's approach arguably isn't consistent with the way Kansas law construes the state's statutes. *See Richards v. Schmidt*, 56 P.3d 274, 276–77 (Kan. 2002) ("In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof *in pari materia*. When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law." (citation and internal quotation marks omitted)); *see also id.* at 276 ("In construing statutes, the legislative intention is to be determined from a general consideration

of the entire act.  Effect must be given, if possible, to the entire act and every part thereof.  To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible." (citation and internal quotation marks omitted)).

The third sentence of subsection (a)—the one plaintiff cites—appears in the prior version of the statute, and the 2018 amendments made no changes to that particular sentence.  But then, the final three sentences of subsection (a)—in its current and amended form—read:

> If *a person appointed as superintendent, assistant superintendent or major* is a member of the patrol when appointed, the person in each case, upon termination of the term as superintendent, assistant superintendent or major, respectively, shall be returned to a rank not lower than the rank the person held when appointed as superintendent, assistant superintendent or major.  If the rank is filled at that time, a temporary additional position shall be created in the rank until a vacancy occurs in such rank.  *All other officers, troopers and employees shall be within the classified service under the Kansas civil service act.*

Kan. Stat. Ann. § 74-2113(a) (emphasis added).  The 2018 amendments to the statute specifically added a protection for Majors to return them to their previous ranks upon termination of their status as Majors.  As defendants argue, these amendments suggest that Majors are part of the unclassified service.  If they aren't, why would the Kansas legislature have amended the statute to provide Majors this protection—the same protection afforded the Superintendent and Assistant Superintendent who are members of the unclassified service?  On the other hand, if Majors already were members of the classified service, then they already would enjoy the protections that come with classified status.  *See* Kan. Stat. Ann. § 75-2949 (providing certain protections to "permanent employee[s] in the classified service" for dismissals, demotions, and suspensions); *see also Befort v. Dep't of Com.*, No. 08-2598-KHV, 2009 WL 10707844, at *2 (D. Kan. Dec. 17, 2009) (explaining that the Kansas Civil Service Act "provides job protections to classified employees" but "[b]y contrast, unclassified employees are at-will employees"

38

(citing Kan. Stat. Ann. §§ 75-2925–75-2975)).  Thus, if KHP Majors already were part of the classified service—as plaintiff contends—the Kansas legislature had no need to amend the statute to provide Majors this protection in their employment at termination of their status as Majors.

The Kansas Supreme Court instructs courts, when interpreting a Kansas statute, must "presume that the legislature does not intend to enact meaningless legislation." *Kan. Dep't of Revenue v. Powell*, 232 P.3d 856, 861 (Kan. 2010) (citations omitted); *see also State v. Van Hoet*, 89 P.3d 606, 615 (Kan. 2004) ("When the legislature revises an existing law, it is presumed that the legislature intended to change the law from how it existed prior to the amendment, and it is presumed that the legislature does not intend to enact useless or meaningless legislation." (citations omitted)).  Also, a "court should avoid interpreting a statute in such a way that part of it becomes surplusage." *Van Hoet*, 89 P.3d at 615 (citation omitted).  Plaintiff's reading of the statute—that Majors are part of the classified service—renders superfluous the protections codified by the 2018 amendments and granted to Majors at termination.  So, these rules of statutory construction suggest that the Kansas legislature amended § 74-2113(a) to include Majors as members of the unclassified service, thus supporting defendants' construction of the statute.

Also, defendants direct the court to the last sentence of § 74-2113(a).  The two sentences preceding the last sentence discuss the protections afforded to the Superintendent, Assistant Superintendent, and Majors at termination from those ranks.  Then, the subsection's last sentence provides:  "*All other officers, troopers and employees* shall be within the classified service under the Kansas civil service act." Kan. Stat. Ann. § 74-2113(a) (emphasis added).  A plain reading of these final three sentences of § 74-2113(a) suggests that the Kansas legislature's 2018

amendments conferred certain employment protections to "a person appointed as superintendent, assistant superintendent or major" and that "[a]ll other officers, troopers and employees" are "within the classified service under the Kansas civil service act." Kan. Stat. Ann. § 74-2113(a).

But—again—the third sentence of the statute specifically identifies the Superintendent and Assistant Superintendent as members of the unclassified service. The Kansas Legislature didn't include Majors in this sentence, even though it had the opportunity to state—explicitly and specifically—that Majors fall within the unclassified service when it amended the statute in 2018. The court heeds the Kansas Supreme Court's directive that it must determine legislative intent "from a general consideration of the entire act" and give "[e]ffect . . . to the entire act and every part thereof." *Richards*, 56 P.3d at 276 (citation and interna quotation marks omitted). But, that task is complicated by the confusing language Kan. Stat. Ann. § 74-2113(a) uses to identify whether certain ranks of the KHP are within the unclassified or classified service. The parties' competing readings of the statute both find support in the plain language of Kan. Stat. Ann. § 74-2113 and Kansas's governing rules of statutory construction make room for each side's perspective. Faced with two different ways to construe this statute, and with no guidance from the case law or legislative history,[6] the court struggles here to decipher the legislative intent

---

[6]     The parties don't cite any legislative history to assist the court in its interpretation of the statute. But defendants' motion discusses testimony that plaintiff, while he held the position of KHP Superintendent, gave to support the 2018 amendments to Kan. Stat. Ann. § 74-2113(a). Doc. 11-3 at 20 (Test. on S.B. 369 Before Kan. S. Comm. on Fed. & State Affairs (Feb. 12, 2018) (presented by Col. Mark A. Bruce, Superintendent Kan. Highway Patrol)). Plaintiff testified that the "purpose of the bill is to restore civil service protection" to "majors within the KHP that lost it as an unintended consequence of [KHP's] Career Progression Plan[.]" *Id.* Plaintiff explained that development of the Career Progression Plan "unintentionally required the highest ranking classified members of the Patrol, our majors, to become unclassified employees" which "made them the only at-will uniformed members in the trooper ranks." *Id.* Plaintiff urged the Senate Committee to pass a bill that "afforded the same, earned protection" to Majors that the Superintendent and Assistant Superintendent enjoy as members "in the unclassified service" but with the statutory protection that requires "at the end of [their] appointments" they return to a position "no [lower] in rank than the last permanent position" they held. *Id.* The court doesn't consider plaintiff's testimony when interpreting the statute because defendants never explain how it affects the question whether the language of the enacted statute—as opposed to the proposed bill

40

of Kan. Stat. Ann. § 74-2113.  When enacting the statute, did the Kansas legislature intend to

include the rank of Major as a member of the classified service or unclassified service of the

Kansas civil service?

 To decide this issue, the court exercises its discretion to certify a question to the Kansas

Supreme Court.  Kan. Stat. Ann. § 60-3201 authorizes federal district courts to certify questions

of law to the Kansas Supreme Court if:

> there are involved in any proceeding before it questions of law of this state which
> may be determinative of the cause then pending in the certifying court and as to
> which it appears to the certifying court there is no controlling precedent in the
> decisions of the supreme court and the court of appeals of this state.

Kan. Stat. Ann. § 60-3201.  The decision to certify rests "within the 'sound discretion of the

federal court[.]'"  *Hartford Ins. Co. v. Cline*, 427 F.3d 715, 716–17 (10th Cir. 2005) (quoting

*Lehman Bros. v. Schein*, 416 U.S. 386, 390–91 (1974)).  And, a "federal court may certify a

state-law issue sua sponte."  *Kan. Jud. Rev. v. Stout*, 519 F.3d 1107, 1120 (10th Cir. 2008) (citing

*Elkins v. Moreno*, 435 U.S. 647, 662 (1978)); *see also* Kan. Stat. Ann. § 60-3202 (explaining that

a court may certify a question under § 60-3201 "upon the court's own motion").

 A court should not "routinely invoke[ ]" certification "whenever a federal court is

presented with an unsettled question of state law."  *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407

(10th Cir. 1988) (citation omitted).  Instead, the federal courts have a duty "'to decide questions

of state law whenever necessary to the rendition of a judgment,'" unless there exists "'some

recognized public policy or defined principle guiding the exercise of the jurisdiction

conferred[.]'"  *Copier ex rel. Lindsey v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir.

1998) (quoting *Meredith v. City of Winter Haven*, 320 U.S. 228, 234 (1943)).  Although

---

plaintiff discussed in his testimony—places Majors within the classified or unclassified service.  And, the
record is missing any legislative history showing whether plaintiff's testimony affected the Kansas
legislature's drafting of the amendments to Kan. Stat. Ann. § 74-2113.

certification is appropriate "where the legal question at issue is novel and the applicable state law is unsettled, it is never compelled." *Soc'y of Lloyd's v. Reinhart*, 402 F.3d 982, 1001 (10th Cir. 2005) (citations and internal quotation marks omitted).

However, certifying a question of state law has the "advantages of 'reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response' from the state court." *Stout*, 519 F.3d at 1119 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1997)). Also, "the procedure promotes 'cooperative judicial federalism,' particularly in circumstances where a state court 'has not yet had the opportunity to interpret the pertinent statutory language[.]'" *Id.* (first quoting *Lehman Bros.*, 416 U.S. at 391; then quoting *Dorman v. Satti*, 862 F.2d 432, 435 (2d Cir. 1988)). Certification is appropriate when "questions of state law" are "both unsettled and dispositive." *Id.* (citation and internal quotation marks omitted).

As discussed above, resolving the issue whether Kan. Stat. Ann. § 74-2113 defines the rank of Major in the KHP as a position within the classified or unclassified service "may be determinative" of plaintiff's § 1983 due process claims. Kan. Stat. Ann. § 60-3201. If the rank of Major is an unclassified position, it is an at-will employment position, and plaintiff held no constitutionally protected property interest in that employment position. So, under this interpretation of the Kansas statute, his § 1983 claims fail. Also, the parties have identified and the court has found "no controlling precedent in the decisions of the supreme court and the court of appeals of" Kansas that decides this issue of Kansas state law. Kan. Stat. Ann. § 60-3201. So, this issue is "both unsettled and dispositive." *Stout*, 519 F.3d at 1119 (citation and internal quotation marks omitted). Thus, the court certifies the following question to the Kansas Supreme Court:

> Does Kan. Stat. Ann. § 74-2113 define the rank of Major in the KHP as a member of the unclassified or classified service of the Kansas civil service?

Having no guidance to decide this dispositive and unsettled question,[7] the court
denies without prejudice defendants' request to dismiss Counts I and II for failing to state
a claim based on the argument that Kan. Stat. Ann. § 74-2113 conferred no
constitutionally protected property interest on plaintiff in continued employment at the
rank of Major as a member of the classified service. The court grants defendants leave to
reassert this argument if the Kansas Supreme Court answers this question in a fashion
that supports their current dismissal arguments.

### c. Does Demotion into the Classified Service Require a Mandatory Probation Period Before Securing Permanent Status?

Next, defendants argue that plaintiff's § 1983 due process claims fail for another reason.
They explain that—even if the rank of Major is considered a classified position in the civil
service—plaintiff's demotion to that position requires him to serve a mandatory probation period
as an at-will employee before he can achieve permanent status as a classified employee.

Kan. Stat. Ann. § 75-2946 provides that "all appointments within the classified service
shall be for a probationary period, the length of which for the several classes in the classified
service shall be determined by rules and regulations, but dismissals, suspensions or demotions

---

[7]    The court recognizes that plaintiff's mandamus proceeding raised this issue in the Kansas
Supreme Court. *See* Doc. 11-1 at 2, 6 (seeking "a writ of mandamus, compelling [Governor Kelly and
Superintendent Jones] to perform their clear legal duty under [Kan. Stat. Ann.] § 74-2113(a)" and "return
[plaintiff] to his rank of Major, with permanent status, in the classified service of the" KHP). But, the
Kansas Supreme Court never decided this question when ruling the mandamus petition. *See* Doc. 11-4 at
1 (assuming "without deciding that there is a mandatory duty" to place plaintiff in the rank of Major with
permanent status "subject to control through a writ of mandamus, the undisputed facts indicate that
Petitioner is not entitled to the relief sought because of his resignation"). As already discussed, the court
concludes that Kansas res judicata and collateral estoppel principles don't bar plaintiff from asserting his
§ 1983 due process claims because his mandamus proceeding did not involve the same claim or issues—
*i.e.*, whether the Kansas statutes confer plaintiff with a constitutionally protected property interest in
employment at the rank of Major as a member of the classified service sufficient to support a § 1983 due
process claim.

may be made at any time during such period." Defendants assert that the Kansas Administrative Regulations establish the probationary period referenced in this statute to last six months. *See generally* Kan. Admin. Regs. 1-7-4. So, in defendants' view, plaintiff never possessed a property interest in continued employment with the KHP at the rank of Major with permanent status in the classified service because these Kansas laws required him to serve a probationary period before securing permanent status in a classified position.

Plaintiff disagrees. He argues that he isn't subject to the probationary period because he already served his mandatory probationary period when he first was appointed to the rank of Major in 2008. Doc. 1 at 3 (Compl. ¶ 11). He cites no authority allowing him to recycle the probationary period that he served more than 10 years ago on his transfer back into a classified position. But, plaintiff argues that Kan. Admin. Regs. § 1-7-4(c) applies to his situation because it confers on each "person rehired on the basis of reemployment . . . permanent status effective on the date of rehire."

Defendants assert that a different subsection of the Kansas Administrative Regulations applies to plaintiff's situation. They contend that § 1-7-4(h) explicitly imposes a mandatory probationary period on any employee "transferred" or "demoted" from "any position in the unclassified service to a regular position in the classified service[.]" Kan. Admin. Regs. § 1-7-4(h). Defendants argue that this subsection applies because, plaintiff alleges, he was asked to resign as KHP Superintendent and that defendants violated his constitutional rights by failing to return him to the rank of Major. Doc. 1 at 3, 7–8 (Compl. ¶¶ 14, 27, 33). These facts, defendants say, don't allege anything about a rehire. Instead, plaintiff complains that defendants didn't transfer him or demote him from his position in the unclassified service to the rank of Major. So, defendants argue, Kan. Admin. Regs. § 1-7-4(h) applies. *See* Kan. Admin. Regs. §

1-7-4(h) (requiring an "employee who is transferred" or "demoted" from "any position in the unclassified service to a regular position in the classified service" to "serve a probationary period of six months").

Again, the court exercises its discretion to certify a question to the Kansas Supreme Court. Based on the facts alleged here, it's unclear whether the Kansas statutes would treat plaintiff's return to the rank of Major as a "rehire" under Kan. Admin. Regs. § 1-7-4(c) which confers "permanent status effective on the date of rehire[,]" or whether plaintiff's return to the rank of Major is considered a "transfer" or "demotion" from the unclassified service to the classified service which requires a six month probationary period under Kan. Admin. Regs. § 1-7-4(h). The answer to this question "may be determinative" of plaintiff's § 1983 due process claims. *See* Kan. Stat. Ann. § 60-3201. Also, the parties have not identified and the court has not found "controlling precedent in the decisions of" the Kansas Supreme Court or Kansas Court of Appeals that answers the question. So, the court also certifies this second question to the Kansas Supreme Court:

> If Kan. Stat. Ann. § 74-2113 defines the rank of Major in the KHP as a member of the classified service, does Kan. Admin. Regs. § 1-7-4 require a former member of the classified service—who already has completed a required probationary period for the classified service—to serve another six month probationary period in the classified service after serving a position within the unclassified service?

Because the court cannot decide this issue currently, it denies without prejudice defendants' request to dismiss Counts I and II for failing to state a claim based on the argument that plaintiff possessed no constitutionally protected property interest in employment at the rank of Major as a member of the classified service because the Kan. Admin. Regs. require him to serve a probationary period before securing status as a member of the classified service. The

court grants defendants leave to reassert this argument if the Kansas Supreme Court answers this question in a way that supports their current dismissal arguments.

### 2. Qualified Immunity Against Count II

Chief of Staff Lawrence also argues he deserves qualified immunity against Count II's claim. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To establish a § 1983 claim against an individual defendant who asserts the defense of qualified immunity, plaintiff must (1) come forward with facts that "make out a violation of a constitutional right," and (2) demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

Defendants argue that qualified immunity shields Chief of Staff Lawrence from liability because (1) plaintiff alleges no violation of a constitutional right, and (2) plaintiff "points to no case that clearly establishes that such a claim—constructive involuntary resignation and retirement—violates procedural due process." Doc. 21 at 7.

For defendants' first argument, as discussed above, the court can't decide whether plaintiff has alleged a constitutional violation. It's not yet clear from the Kansas statute whether plaintiff had a constitutionally protected property interest in employment at the rank of Major as a member of the classified service. If the Kansas Supreme Court concludes that the Kansas statute conferred plaintiff with a constitutionally protected property interest, then he has alleged a

constitutional violation—*i.e.*, that defendants terminated his employment through a constructive discharge without due process.  Without an answer to the constitutionally protected property interest question, the court can't decide whether plaintiff overcomes the first prong of the qualified immunity defense.

For defendants' second argument, they are wrong that plaintiff fails to cite a case that clearly establishes the constitutional right—assuming that plaintiff had a constitutionally protected property interest in returning to the rank of Major as a member of the classified service.  Plaintiff cites *Parker v. Board of Regents of Tulsa Junior College*, 981 F.2d 1159, 1162 (10th Cir. 1992).  Doc. 15 at 20.  *Parker* explained that "[t]he law in effect at the time of plaintiff's resignation indicates that the voluntariness of the decision to resign is determinative of whether qualified immunity would bar" a § 1983 due process claim.  And, if an employee's "resignation was so involuntary it amounted to a constructive discharge, defendants did deprive [him] of [a] property interest without due process." *Id.* (citing *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1988)).  As already discussed, plaintiff has alleged facts from which a factfinder could find or infer constructive discharge.  And, plaintiff has shown under *Parker* that the law clearly established that a constructive discharge deprives an employee of a protected property interest without due process.  *Id.*  Thus, if plaintiff had a constitutionally protected property interest in returning to the rank of Major as a member of the classified service, then he has identified case law that clearly established a constitutional violation.

Without guidance from the Kansas Supreme Court, the court also can't decide whether qualified immunity applies to bar plaintiff's § 1983 due process claim against Chief of Staff Lawrence.  Thus, the court denies defendants' dismissal argument based on qualified immunity against Count II.  But, the court denies this portion of the motion without prejudice to reasserting

the argument if the Kansas Supreme Court's answers to the certified questions support the

qualified immunity defense.

### 3. Tortious Interference (Count III)

Defendants argue that Count III also fails to state a claim as a matter of law. Count III

asserts a Kansas common law claim for tortious interference with prospective business relations

against Chief of Staff Lawrence in his individual capacity. Kansas law indeed recognizes a

cause of action for tortious interference with a prospective business advantage or relationship.

*Turner v. Halliburton Co.*, 722 P.2d 1106, 1115 (Kan. 1986). The elements of the claim are: (1)

"the existence of a business relationship or expectancy with the probability of future economic

benefit to the plaintiff;" (2) the defendant knew of the relationship or expectancy with the

probability of future economic benefit to the plaintiff; (3) "that, except for the conduct of the

defendant, plaintiff was reasonably certain to have realized the expectancy;" (4) "intentional

misconduct by the defendant;" and (5) damages sustained by plaintiff as a direct or proximate

cause of the defendant's misconduct. *Id.*

Defendants ask the court to dismiss Count III for two reasons.

*First*, defendants assert that a tortious interference claim "requires some type of

communication between the defendant and the third party in which the defendant induces the

third party not to engage in a prospective contract or business relation with the plaintiff."

*PulseCard, Inc. v. Discover Card Servs., Inc.*, 917 F. Supp. 1488, 1498 (D. Kan. 1996); *see also*

Restatement (Second) of Torts § 766B (1979) (reciting that the tort requires that defendant

induced, prevented, or otherwise caused "a third person not to enter into or continue the

prospective relation" (cited in *Noller v. GMC Truck & Coach Div.*, 772 P.2d 271, 276 (Kan.

1989)). Thus, an "official of a corporation, acting for the corporation, and within the scope of

48

his or her representation of the corporation" cannot commit tortious interference with the corporation's own contract or expectancy. *Diederich v. Yarnevich*, 196 P.3d 411, 418 (Kan. Ct. App. 2008) (citing *Clevenger v. Cath. Soc. Serv. of Archdiocese*, 901 P.2d 529, 533 (Kan. Ct. App. 1995)). In these situations, "[i]t is the corporation acting," not the director or officer. *Id.* But, if "an employee is motivated entirely by personal reasons such as malice or spite or by a desire to accomplish some unlawful purpose and does not have for its purpose the furtherance of the employer's business," that employee acts outside the scope of his employment and can be incur liability for tortious interference. *Williams v. Cmty. Drive-In Theater, Inc.*, 520 P.2d 1296, 1301–02 (Kan. 1974).

Defendants argue that plaintiff fails to state a tortious interference claim against Chief of Staff Lawrence because he was acting within the scope of his employment for the state and on behalf of the state when he asked plaintiff to resign as KHP Superintendent. Thus, defendants argue, Chief of Staff Lawrence didn't prevent a third party from entering or continuing with a prospective business relationship. But, plaintiff redirects the court to his Complaint where he specifically alleges that Chief of Staff Lawrence's conduct was "reckless or intentional, malicious, and outside the scope of his employment or authority." Doc. 1 at 10 (Compl. ¶ 42). Taking these allegations as true, plaintiff has asserted that Chief of Staff Lawrence, acting outside of the scope of his employment, induced a third party to terminate plaintiff's alleged prospective business relationship. These allegations suffice, at this stage of the proceedings, to state a tortious interference claim against Chief of Staff Lawrence.[8]

---

[8]     Defendants' Reply argues that if Chief of Staff Lawrence was acting outside the scope of his employment, then plaintiff's § 1983 claim against him fails as a matter of law because the "under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). Plaintiff's Count II—his § 1983 claim against Chief of Staff Lawrence—alleges that Chief of Staff Lawrence was acting under color of state law. Doc. 1 at 8–9 (Compl. ¶¶ 33–34). So, plaintiff has satisfied this pleading

*Second*, defendants argue that plaintiff fails to allege facts supporting the first element of a tortious interference claim for the same reasons already discussed—that is, plaintiff, as an at-will employee, had no business expectancy in continued employment.  And thus, plaintiff can't assert a Kansas tortious inference claim as a matter of law.  Doc. 11 at 30 (collecting cases); *see also Pierce v. PrimeRevenue, Inc.*, No. 17-2233-JTM, 2017 WL 4552136, at *3 (D. Kan. Oct. 12, 2017) (dismissing tortious interference claim because there was "no question that [plaintiff] was at all relevant times an at-will employee" and thus plaintiff "had no claim for interference with any reasonable business expectation"); *Jackson v. Kan. Cnty. Ass'n Multiline Pool*, No. 03-4181-JAR, 2006 WL 963838, at *20 (D. Kan. Apr. 10, 2006) (explaining that plaintiff "as an at-will employee, had no business expectancy when he could be fired at anytime"); *Babbar v. Ebadi*, 36 F. Supp. 2d 1269, 1276 (D. Kan. 1998) (granting summary judgment against tortious inference with business expectancy claim because plaintiff—an untenured teacher—failed to show he was "reasonably certain to have continued his relationship with the University" and no triable issue existed whether he had a "prospective business advantage").

Plaintiff never responds explicitly to this argument.  Instead, plaintiff asserts that Kan. Stat. Ann. § 74-2113(a) conferred him with a business expectancy in continued employment "with the KHP at the rank of Major in the classified service."  Doc. 15 at 16–17.  For the same reasons already explained, the court can't yet answer this question without guidance from the Kansas Supreme Court interpreting whether Kan. Stat. Ann. § 74-2113 defines the rank of Major in the KHP as a member of the unclassified or classified service.  So, the court can't decide

---

requirement of a § 1983 claim.  And, to the extent plaintiff's allegations about Chief of Staff Lawrence conflict among his alternative claims, the court won't dismiss the claims for that reason.  "Fed. R. Civ. P. 8(d) specifically allows for the pleading of inconsistent claims and inconsistent facts."  *United States v. Roe*, 913 F.3d 1285, 1300 n.21 (10th Cir. 2019) (citation omitted).  In sum, the rules of procedure permit plaintiff to plead inconsistent theories.  Such inconsistency is no reason to dismiss claims at the pleading stage.

whether plaintiff has alleged "the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff." *Turner*, 722 P.2d at 1115. The court thus denies defendants' Motion to Dismiss Count III but it does so without prejudice to refiling should the Kansas Supreme Court answer the certified questions in a way that supports defendants' argument that plaintiff's tortious interference claim fails because he has alleged no business expectancy sufficient to support the claim.

### 4. Conclusion

For the above-stated reasons, the court denies without prejudice plaintiff's Motion to Dismiss Counts I, II, and III under Fed. R. Civ. P. 12(b)(6).

### D. Qualified Immunity Bars Plaintiff's First Amendment Claim (Count IV).

Defendants next argue that plaintiff's Count IV fails to state a claim. Count IV alleges that Superintendent Jones deprived plaintiff of his "right of free speech by blocking" him from sending emails to "the email accounts of all current employs of the KHP maintained @ks.gov." Doc. 1 at 11 (Compl. ¶¶ 48–49). In addition to their argument that Count IV fails to state a claim, defendants also argue that Superintendent Jones deserves qualified immunity against this claim. The court agrees with defendants' qualified immunity argument. So, it just addresses this argument, below.

As already discussed, to overcome a qualified immunity defense, a plaintiff must do two things: (1) come forward with facts that "make out a violation of a constitutional right," and (2) demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier*, 533 U.S. at 201). Here, plaintiff fails the second prong. *Id.* at 236 (explaining that a court has discretion "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand").  Plaintiff hasn't identified any Supreme Court or Circuit cases that clearly establish that Superintendent Jones violated plaintiff's First Amendment rights by blocking him from sending emails to all current KHP employees at email accounts maintained @ks.gov.

The First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const. amend. I.  It also applies "to the States under the Due Process Clause of the Fourteenth Amendment."  *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996) (citations omitted).

Despite the First Amendment's prohibitions against the government restricting speech, "it is also well settled that the government need not permit all forms of speech on property that it owns and controls."  *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (citations omitted); *see also Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) (recognizing that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government" (citation and internal quotation marks omitted)).  "Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject."  *Lee*, 505 U.S. at 678.

"The extent of the government's ability to restrict protected speech on public property depends upon the nature of the forum and whether the speech restriction is content-based or content-neutral."  *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281, 1286 (10th Cir. 1999) (citing *Lee*, 505 U.S. at 678–79).  "The Supreme Court has identified three distinct categories of

government property:  (1) traditional public fora; (2) designated public fora; and (3) nonpublic
fora."  *Id.* (first citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998); then
citing *Perry*, 460 U.S. at 45–46).

The first category—traditional public fora—"are places that 'by long tradition or by
government fiat have been devoted to assembly and debate'" such as "streets, sidewalks, and
parks[.]"  *Id.* (quoting *Perry*, 460 U.S. at 45).  "The government's ability to restrict speech in a
traditional public forum is quite limited" and "depends upon whether the speech restriction is
content-based or content-neutral."  *Id.*  The second category—designated public fora—are places
that "a state creates 'by *intentionally* opening a non-traditional forum for public discourse.'"  *Id.*
(quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)).  The
Supreme Court has explained that "a State is not required to indefinitely retain the open
character" of a designated public fora but "as long as it does so it is bound by the same standards
as apply in a traditional public forum."  *Perry*, 460 U.S. at 46.  The third category—nonpublic
fora—"consists of any remaining government property that 'is not by tradition or designation a
forum for public communication.'"  *Hawkins*, 170 F.3d at 1287 (quoting *Perry*, 460 U.S. at 46).
"In a nonpublic forum, the government has much greater latitude to restrict protected speech."
*Id.*  It doesn't matter whether the restrictions are content-neutral and content-based.  *Id.*  So long
as "the restriction is reasonable in light of the purpose served by the forum and is 'not an effort
to suppress expression merely because public officials oppose the speaker's view,' it does not
violate the First Amendment."  *Id.* (quoting *Forbes*, 523 U.S. at 677–78).

Plaintiff alleges that the email system for KHP employees maintained @ks.gov. qualifies
as "a public forum."  Doc. 1 at 11 (Compl. ¶ 46).  And, he contends, Superintendent Jones
"deprived [him] of his constitutional right of free speech by blocking [him] from using a public

forum." *Id.* (Compl. ¶ 49). But, these conclusory assertions don't carry the day. *See Iqbal*, 556 U.S. at 678 (explaining that while the court must assume that the factual allegations in the complaint are true, it is "'not bound to accept as true a legal conclusion couched as a factual allegation'" (quoting *Twombly*, 550 U.S. at 555)). Also, the court can't find that the law "clearly established" that blocking someone from sending emails to state employees on a state-owned email system violates the First Amendment. *Pearson*, 555 U.S. at 232 (quoting *Saucier*, 533 U.S. at 201).

To the contrary, several courts—including the Supreme Court—have held that government mail and email systems are not state-created public forums. *See Perry*, 460 U.S. at 46–47 (holding that a public school's "mail facilities" was a nonpublic forum because there was "no indication . . . that the school mailboxes and interschool delivery system are open for use by the general public"); *see also Page v. Lexington Cnty. Sch. Dist. One*, 531 F.3d 275, 285 (4th Cir. 2008) (finding that "School District's e-mail facility" was a nonpublic forum because there was "no suggestion that" the public "had access to the School District's e-mail facility"); *Fac. Rts. Coal. v. Shahrokhi*, 204 F. App'x 416, 418 (5th Cir. 2006) (applying the nonpublic forum test to a First Amendment challenge against a university's restrictions on adjunct faculty members' access to university email accounts); *Loving v. Boren*, 956 F. Supp. 953, 955 (W.D. Okla. 1997) (holding that the University of Oklahoma's "computer and Internet services do not constitute a public forum" because nothing suggested that "the facilities have ever been open to the general public or used for public communication"), *aff'd*, 133 F.3d 771 (10th Cir. 1998).

Similar to the forums at issue in these cases, plaintiff alleges here that Superintendent Jones restricted his ability to send emails to "official KHP email addresses" for all current employees of the KHP maintained @ks.gov. Doc. 1 at 6 (Compl. ¶ 23). He alleges that the

email accounts for all current employees of the KHP "are owned and controlled by the State of Kansas" and "are primarily used by the employees of the KHP to conduct official business, and to interact with the public." Doc. 1 at 5 (Comp. ¶ 19). But, the Complaint contains no allegation that the KHP email system is open or accessible to the public.

Plaintiff takes the argument in a completely different direction. He argues that "internet media" can constitute a public forum. Doc. 15 at 23. For support, he cites several recent Circuit cases holding that a social media page or account may qualify as a public forum. *See Knight First Amendment Inst. at Colum. Univ. v. Trump*, 928 F.3d 226, 237 (2d. Cir. 2019), *vacated as moot Biden v. Knight First Amendment Inst. at Colum. Univ.*, 141 S. Ct. 1220 (2021) (holding that President Trump "created a public forum" with his Twitter account because he "intentionally opened" the account "for public discussion" and "upon assuming office, repeatedly used the Account as an official vehicle for governance and made its interactive features accessible to the public without limitation"); *see also Davison v. Randall*, 912 F.3d 666, 687 (4th Cir. 2019) (concluding that a Facebook page's "interactive component" made it a "public forum"); *Lloyd v. City of Streetsboro*, No. 18-3485, 2018 WL 11298664, at *4 (6th Cir. Dec. 20, 2018) (remanding trial court's dismissal of First Amendment claim against a city because plaintiff alleged that the city had blocked her from the city's Facebook page which she asserted was "an official webpage"). These cases simply don't apply to the KHP email system.

Each case cited by plaintiff involved a social media account that was accessible to the public. Nothing in the Complaint alleges that the public could access the state-owned KHP email system that KHP employees use to conduct official business. Doc. 1 at 5 (Comp. ¶ 19). Thus, the KHP email system is not similar to the social media pages and accounts addressed in plaintiff's cited cases. *See Straw v. United States*, No. 3:19-cv-02531-JMC, 2020 WL 3496552,

at *4–5 (D.S.C. June 29, 2020) (holding that plaintiff failed to state a First Amendment claim against the government for "deleting his emails without reading them" and explaining that the facts alleged differed from the Second Circuit's decision in *Knight* because that case "involved Twitter which is an 'interactive space'" (quoting *Knight*, 928 F.3d at 233)).

As a consequence, plaintiff's cited cases couldn't have put Superintendent Jones on notice that the KHP email system is a public forum and that he was violating plaintiff's First Amendment rights by blocking him from sending emails to KHP employees at email addresses maintained @ks.gov. *See Lloyd*, 2018 WL 11298664, at *5 (holding that plaintiff "has cited no decision from the Supreme Court, this court or other courts in this circuit, or any other circuit court to support her position" that city employee violated her First Amendment rights, and thus "it cannot be said that it was reasonably clear to [the employee] that her alleged act of blocking [plaintiff] from the City's Facebook page violated a clearly established constitutional right").

But plaintiff also argues that—even if the KHP email system is a nonpublic forum— Superintendent Jones violated plaintiff's First Amendment rights by blocking his emails because he did so based on "the viewpoints [plaintiff] had expressed." Doc. 1 at 11 (Compl. ¶ 49). To support this argument, plaintiff cites *Summum v. Callaghan*, 130 F.3d 906 (10th Cir. 1997). In that case, a church asked to place a monument with its own religious tenets on the front lawn of the county courthouse where a monument of the Ten Commandments already stood. *Id.* at 910–11. The county denied the church's request, and the church filed a lawsuit alleging a First Amendment violation. *Id.* at 911. The Circuit described the law governing speech in nonpublic forums as follows:

> [A]lthough content-based discrimination is permissible in a limited or nonpublic forum if it preserves the purpose of the forum, when the government moves beyond restricting the subject matter of speech and targets particular views taken by speakers on a subject, *such viewpoint discrimination is presumed impermissible*.

Viewpoint discrimination is thus a subset of and an egregious form of content discrimination.

*Id.* at 917 (emphasis added) (citations and internal quotation marks omitted). Our Circuit also recognized, though, that "the government does have wide discretion to regulate a nonpublic forum consistent with the specific purpose for which it was intended—including banning all speech displays" but, it explained, "problems arise when the government allows some private speech on the property" while excluding others. *Id.* at 918. "If, for example, the government permits secular displays on a nonpublic forum, it cannot ban displays discussing otherwise permissible topics from a religious perspective." *Id.* The Circuit reversed the district court's Rule 12(b)(6) dismissal of the church's Complaint, finding that the church had "sufficiently stated a claim for relief under the Free Speech Clause." *Id.* at 919–20. And, it remanded the case with instructions to the district court to "carefully scrutinize the validity of the County's stated reasons for refusing access to the courthouse lawn to ensure that the County's justifications are not simply 'post hoc rationalizations' or a pretext for viewpoint discrimination." *Id.* at 920.

Plaintiff argues that *Summum* plainly establishes that "viewpoint discrimination is presumed impermissible." *Id.* at 917. And thus, he contends Superintendent Jones violated plaintiff's clearly established constitutional rights because he blocked plaintiff from sending emails based on his viewpoints. The court disagrees. The Circuit's decision in *Summum* didn't put Superintendent Jones on notice that he was violating plaintiff's First Amendment rights when he blocked plaintiff from sending emails to KHP employees at email addresses maintained @ks.gov. As the Supreme Court has explained, a "clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (citations and internal quotation

marks omitted). The Supreme Court has instructed courts not to define the right at issue "'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Mullenix*, 136 S. Ct. at 308 ("This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (citation and internal quotation marks omitted)). The First Amendment right addressed in *Summum—i.e.*, the right against the government banning some types of religious displays while allowing others in a nonpublic forum—does not present the same type of right at issue in Superintendent Jones's decision to block plaintiff from sending emails to KHP employees at their state-owned email addresses. Simply, plaintiff alleges no facts supporting a finding or inference that Superintendent Jones permitted some speech on the KHP email system to the exclusion of plaintiff's speech based on plaintiff's viewpoint. Though plaintiff alleges that Superintendent Jones blocked his emails "because of the viewpoints which he had expressed[,]" Doc. 1 at 11 (Compl. ¶ 48), the court needn't accept that conclusory assertion as true, *Iqbal*, 556 U.S. at 678.

Also, plaintiff can't show that the law clearly established that his emails complaining to KHP employees at their work email addresses was unlawful viewpoint discrimination. As plaintiff alleges, the KHP found plaintiff's emails "unwanted and disruptive to the working environment of the Patrol." Doc. 1 at 6 (Compl. ¶ 21). As many courts have recognized, restrictions on disruptive speech do not constitute viewpoint discrimination when the purpose of the restriction is to curtail disruptive behavior and not to silence the speaker's viewpoint. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 811 (1985) ("The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a

nonpublic forum and hinder its effectiveness for its intended purpose."); *Barr v. Lafon*, 538 F.3d 554, 572 (6th Cir. 2008) (holding that "school's ban on disruptive speech does not engage in viewpoint discrimination"); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366 (10th Cir. 2000) (holding that school district official didn't violate student's First Amendment rights because they "had reason to believe that a student's display of the Confederate flag might cause disruption and interfere with the rights of other students").  Save a single conclusory one, plaintiff alleges no facts that could support a finding or inference that Superintendent Jones blocked plaintiff's emails—not because of their unwanted and disruptive nature—but because he wanted to silence plaintiff's viewpoint.

In sum, on these alleged facts, plaintiff fails to demonstrate that Superintendent Jones's conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson*, 555 U.S. at 231 (citation and internal quotation marks omitted).  Thus, the court concludes that Superintendent Jones is entitled to qualified immunity against Count IV's claim.

## V.     Conclusion

For reasons explained, the court grants defendants' Motion to Dismiss in part and denies without prejudice the motion in part.  The court dismisses Count IV because Superintendent Jones is entitled to qualified immunity against this claim.  Also, the court dismisses any of plaintiffs' claims that one could construe as claims seeking money damages from state officials sued in their official capacities because Eleventh Amendment immunity bars those claims.

The court denies without prejudice defendants' request to dismiss Counts I, II, and III because the court can't decide whether plaintiff has stated plausible claims without guidance from the Kansas Supreme Court whether the Kansas statutes confer on plaintiff a right to return

to the rank of Major in the KHP as a member of the classified service. The court thus submits this request to the Kansas Supreme Court to exercise its discretion to accept the following two certified questions of Kansas law under Kan. Stat. Ann. § 60-3201. The answers to these questions likely are dispositive to the claims remaining in this lawsuit. And, the court has located no controlling precedent from the Kansas Supreme Court or the Kansas Court of Appeals on these two issues.

### *The Questions*

1.      Does Kan. Stat. Ann. § 74-2113 define the rank of Major in the KHP as a member of the unclassified or classified service of the Kansas civil service?

2.      If Kan. Stat. Ann. § 74-2113 defines the rank of Major in the KHP as a member of the classified service, does Kan. Admin. Regs. § 1-7-4 require a former member of the classified service—who already has completed a required probationary period for the classified service—to serve another six month probationary period in the classified service after serving as a member of the unclassified service?

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 11) is granted in part and denied without prejudice in part.

**IT IS FURTHER ORDERED** that the two questions of law identified above are certified to the Kansas Supreme Court. The court directs the Clerk of this Court to forward to the Kansas Supreme Court a copy of this Memorandum Order, along with copies of the briefs and exhibits submitted by the parties supporting and opposing defendants' Motion to Dismiss (Doc. 11 (including attached exhibits), Doc. 15, & Doc. 21). The Clerk also shall comply with any subsequent requests made by the Kansas Supreme Court for the original or copies of all or any portion of the record in this case.

**IT IS FURTHER ORDERED** that the case is stayed pending the Kansas Supreme

Court's resolution of the certified questions. The court directs the parties to file a notice with the

court within 10 days of the Kansas Supreme Court issuing an order on the two certified questions

of law.

**IT IS SO ORDERED.**

**Dated this 21st day of September 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
